Alfredo **FORTI** and Debora **Benchoam, Plaintiffs,**

v.

Carlos Guillermo **SUAREZ–MASON, Defendant.**

No. C–87–2058 DLJ.

United States District Court, N.D. California.

Oct. 6, 1987.

Cal., and David Cole of the Center for Constitutional Rights of New York, for plaintiffs.

Jack Hill and David Nickerson, San Francisco, Cal., for defendant.

## MEMORANDUM DECISION AND ORDER

JENSEN, District Judge.

On July 22, 1987 this Court heard oral argument on defendant's motions to dismiss pursuant to Rule 12(b)(1) & (6) of the Federal Rules of Civil Procedure and for a stay of proceedings. Plaintiffs Alfredo Forti and Debora Benchoam appeared through Kathy J. Bagdonas, Paul T. Friedman, and David Cole. Defendant Carlos Guillermo Suarez–Mason appeared through Jack Hill and David Nickerson.

On the basis of suggestions raised in the parties' moving papers and made at the hearing, the Court requested supplemental briefing on certain choice-of-law issues. Having now considered all of the parties' submissions in support of and opposition to defendant's motions, the Court hereby denies defendant's motion to dismiss and grants a temporary stay. An explanation of the Court's ruling follows.

## I.

## FACTS

This is a civil action brought against a former Argentine general by two Argentine citizens currently residing in the United States. Plaintiffs Forti and Benchoam sue on their own behalf and on behalf of family members, seeking damages from defendant Suarez–Mason for actions which include, *inter alia*, torture, murder, and prolonged arbitrary detention, allegedly committed by military and police personnel under defendant's authority and control. As will be discussed more fully below, plaintiffs predicate federal jurisdiction on 28 U.S.C. §§ 1350 (the "Alien Tort Statute") and 1331. They claim jurisdiction for their various state-law claims under the doctrine of pendent and ancillary jurisdiction.

Kathy J. Bagdonas and Paul T. Friedman of Morrison & Foerster, San Francisco,

A brief recitation of the procedural background and historical context of this action is useful for a complete understanding of the issues raised by defendant's motion to dismiss. The events described and discussed in this opinion are drawn from the allegations of the Complaint and representations in the parties' moving papers. The Court makes no findings of fact with respect to these events.

### A. Background

■ Plaintiffs' action arises out of events alleged to have occurred in the mid- to late 1970s during Argentina's so-called "dirty war" against suspected subversives.[1] In 1975 the activities of terrorists representing the extremes of both ends of the political spectrum induced the constitutional government of President Peron to declare a "state of siege" under Article 23 of the Argentine Constitution.[2] President Peron also decreed that the Argentine Armed Forces should assume responsibility for suppressing terrorism. The country was accordingly divided into defense zones, each assigned to an army corps. In each zone the military was authorized to detain suspects and hold them in prison or in military installations pursuant to the terms of the "state of siege." Zone One—which included most of the Province of Buenos Aires and encompassed the national capital —was assigned to the First Army Corps. From January 1976 until January 1979 defendant Suarez-Mason was Commander of the First Army Corps.

On March 24, 1976 the commanding officers of the Armed Forces seized the government from President Peron. The ruling military junta continued the "state of siege" and caused the enactment of legislation providing that civilians accused of crimes of subversion would be judged by military law. *See, e.g.,* Law 21.264. In the period from 1976 to 1979, tens of thousands of persons were detained without charges by the military, and it is estimated that more than 12,000 were "disappeared," never to be seen again. *See generally Nunca Mas: The Report of the Argentine National Commission on the Disappeared* (1986).

■ In January 1984 the constitutionally elected government of President Raul Alfonsin assumed power. The Alfonsin government commenced investigations of alleged human rights abuses by the military, and the criminal prosecution of certain former military authorities followed. The government vested the Supreme Council of the Armed Forces with jurisdiction over the prosecution of military commanders. Summoned by the Supreme Council in March 1984, defendant failed to appear and in fact fled the country. In January of 1987 Suarez-Mason was arrested in Foster City, California pursuant to a provisional arrest warrant at the request of the Republic of Argentina. While defendant was in custody awaiting an extradition hearing he was served with the Complaint herein.[3]

---

**1.** The Court relies for its understanding of these events on both sides' moving papers. In addition, the Court takes judicial notice of the allegations contained in the submission of the Republic of Argentina in pending proceedings for the extradition of defendant, *In the Matter of the Requested Extradition of Carlos Suarez Mason,* C-87-0023 MISC DLJ; Argentina's submission includes affidavits, Argentine court opinions, and the report of the National Commission on Missing Persons. Fed.R.Evid. 201; *Schweitzer v. Scott,* 469 F.Supp. 1017, 1020 (C.D.Cal.1979).

**2.** Article 23 of the Argentine Constitution provides:

In the event of internal disorder or foreign attack endangering the operation of this Constitution and the authorities created thereby, the Province or territory in which the disturbance of order exists shall be declared in a

state of siege and the constitutional guarantees shall be suspended therein. But during such suspension the President of the Republic shall not convict or apply punishment upon his own authority. His power shall be limited, in such a case, with respect to persons, to arresting them or transferring them from one point of the Nation to another, if they do not prefer to leave Argentine territory.

Declaration of Alejandro M. Garro in Support of Opposition to Dismiss and Request for Stay ["Garro Declaration"] ¶ 14.

**3.** Personal jurisdiction is thus not at issue in this action. Moreover, by failing to raise the issue in his motion to dismiss, defendant has waived the defense of lack of personal jurisdiction. Fed.R.Civ.P. 12(h)(1).

In addition to the instant action two other civil actions have been instituted against defend-

Because of their importance to the issues raised by the dismissal motion, the Court provides a detailed recitation of plaintiffs' allegations.

## B. Allegations of the Complaint

The Complaint alleges claims for damages based on acts allegedly committed by personnel within the defense zone under General Suarez–Mason's command. According to the Complaint, police and military officials seized plaintiff Alfredo Forti, along with his mother and four brothers, from an airplane at Buenos Aires' Ezeiza International Airport on February 18, 1977. Compl. ¶¶ 3, 10. The entire family was held at the "Pozo de Quilmes" detention center, located in a suburb of Buenos Aires in Buenos Aires Province. *Id.* ¶¶ 3, 11. No charges were ever filed against the Fortis. After six days the five sons were released, dropped blindfolded on a street in the capital. The mother, Nelida Azucena Sosa de Forti, was not released, and remains "disappeared" to this day, despite efforts on behalf of the Forti family by the Interamerican Commission on Human Rights and several members of the United States Congress. *Id.* ¶¶ 3, 11–12, 14.

When seizing the six members of the Forti family at Ezeiza Airport, the authorities also allegedly seized all of the family's belongings, which included several thousand dollars in cash. To date, only some personal effects have been returned. *Id.* ¶ 13.

An Argentine court which adjudicated criminal liability of the nine former junta members has attributed direct responsibility for the February 18, 1977 seizure of the Forti family to the First Army Corps. *Id.* ¶ 16.

As to plaintiff Debora Benchoam, the Complaint alleges that Benchoam and her brother were abducted from their Buenos Aires bedroom before dawn on July 25, 1977 by military authorities in plain clothes. *Id.* ¶¶ 4, 17. At the time Benchoam was sixteen years old and her brother, seventeen.

Benchoam was blindfolded and taken first to an unidentified house and later to a police station in Buenos Aires, where she was held incommunicado for a month. *Id.* ¶ 18. For the first week of detention Benchoam was kept blindfolded with her hands handcuffed behind her back, and was provided neither food nor clothing. A guard attempted to rape her. *Id.*

On August 28, 1977, allegedly at the direction of defendant Suarez–Mason, Benchoam was transferred to Devoto Prison in Buenos Aires. Here she was imprisoned, without charge, for more than four years. *Id.* ¶ 19. In 1979 or 1980 plaintiff obtained a writ of habeas corpus, but the writ was reversed on appeal. Finally, as a result of international and domestic appeals, plaintiff was granted the "right of option" and allowed to leave the country. She was released from prison on November 5, 1981 and came to the United States as a refugee. *Id.* ¶¶ 8, 19.

The military personnel also abducted plaintiff's seventeen-year-old brother on July 25, 1977. *Id.* ¶¶ 4, 20. The brother's body was returned to the Benchoam family the following day. He had died of internal bleeding from bullet wounds, and his face was "severely disfigured" from blows. *Id.* ¶ 20.

Additionally, plaintiff's abductors allegedly stole jewelry, cash, and clothing valued at $20,000, none of which has ever been returned. *Id.* ¶ 21.

Although the individual acts are alleged to have been committed by military and police officials, plaintiffs allege that these actors were all agents, employees, or representatives of defendant acting pursuant to a "policy, pattern and practice" of the First Army Corps under defendant's command. Plaintiffs assert that defendant "held the highest position of authority" in Buenos Aires Province; that defendant was responsible for maintaining the prisons and detention centers there, as well as the conduct of

ant, seeking damages for acts committed during defendant's tenure as Commander of the First Army Corps. *Martinez–Baca v. Suarez–Mason,* C–87–2057 SC (N.D.Cal. filed April 30, 1987); *de Rapaport v. Suarez–Mason,* C–87–2266 JPV (N.D.Cal. filed May 6, 1987).

Army officers and agents; and that he "authorized, approved, directed and ratified" the acts complained of. *Id.* ¶¶ 23–24.

Plaintiff Forti filed a criminal complaint against defendant and others in November 1983, shortly after the election of President Alfonsin. That complaint has not yet been adjudicated as against Suarez–Mason. *Id.* ¶ 15. Plaintiff Benchoam has apparently not filed criminal charges against defendant.[4] Although both plaintiffs retain their Argentine citizenship, both reside currently in Virginia. *Id.* ¶¶ 7–8. Plaintiffs predicate federal jurisdiction principally on the "Alien Tort Statute," 28 U.S.C. § 1350, and alternatively on federal question jurisdiction, 28 U.S.C. § 1331. Additionally, they assert jurisdiction for their common-law tort claims under principles of pendent and ancillary jurisdiction. *Id.* ¶ 5.

Based on these above allegations, plaintiffs seek compensatory and punitive damages for violations of customary international law and laws of the United States, Argentina, and California. They press eleven causes of action. Both allege claims for torture; prolonged arbitrary detention without trial; cruel, inhuman and degrading treatment; false imprisonment; assault and battery; intentional infliction of emotional distress; and conversion. Additionally Forti claims damages for "causing the disappearance of individuals," and Benchoam asserts claims for "murder and summary execution," wrongful death, and a survival action.

In response to these allegations, defendant moves to dismiss the entire Complaint under Federal Rule of Civil Procedure 12(b), subsections (1) and (6). He argues that the Court lacks subject matter jurisdiction under 28 U.S.C. § 1350 to adjudicate tort claims arising out of "politically motivated acts of violence in other countries" and, alternatively, that not all of the torts alleged constitute violations of the law of nations. Defendant also argues that adjudication of plaintiffs' claims is barred by

the fact of state doctrine, which prohibits United States courts from adjudicating the legality of the actions of a foreign government official acting in his official capacity. Further, he contends that plaintiffs' claims are time-barred under the applicable Argentine statute of limitations; that plaintiffs have failed to join indispensable parties, and that plaintiff Benchoam lacks capacity to sue for her brother's death.

The Court will address in turn each of defendant's contentions.

## II.

### SUBJECT MATTER JURISDICTION

As a threshold matter, defendant argues that the Court lacks subject matter jurisdiction under 28 U.S.C. § 1350, the "Alien Tort Statute." Defendant urges the Court to follow the interpretation of § 1350 as a purely jurisdictional statute which requires that plaintiffs invoking it establish the existence of an independent, private right of action in international law. Defendant argues that the law of nations provides no tort cause of action for the acts of "politically motivated terrorism" challenged by plaintiffs' Complaint. Alternatively, defendant argues that even if § 1350 provides a cause of action for violations of the law of nations, not all of the torts alleged by plaintiffs qualify as violations of the law of nations. For the reasons set out below, the Court rejects defendant's construction of § 1350 and finds that plaintiffs allege sufficient facts to establish subject matter jurisdiction under both the Alien Tort Statute and 28 U.S.C. § 1331. However, the Court agrees with defendant that not all of the alleged claims constitute "international torts" cognizable under 28 U.S.C. § 1350. Accordingly, the Court dismisses with prejudice the claims for "causing disappearance" and "cruel, inhuman, or degrading treatment." Further, the Court orders plaintiffs to amend the Complaint to state

---

**4.** Although the Complaint alleges that Benchoam filed a criminal complaint against defendant and others in January 1984, Complaint ¶ 22, Benchoam now states that she "never succeeded, in fact, in having her criminal complaint against defendant filed." Plaintiffs' Supplemental Statement in Opposition to Motion to Dismiss 2–3. The record does not indicate what efforts, if any, Benchoam made to file charges against defendant.

more definitely the facts constituting their claim for official torture.

## A. The Alien Tort Statute

■ The Alien Tort Statute provides that federal district courts shall have "original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350 (1982). The district courts' jurisdiction is concurrent with that of state courts. *See* Act of Sept. 24, 1789 (First Judiciary Act), ch. 20, § 9, 1 Stat. 73, 77. As the cases and commentaries recognize, the history of the Alien Tort Statute is obscure. *See, e.g., IIT v. Vencap, Ltd.,* 519 F.2d 1001, 1015 (2d Cir.1975) (§ 1350 a "kind of legal Lohengrin"). Nonetheless, the proper interpretation of the statute has been discussed at some length in the principal decisions upon which the parties rely: the unanimous decision in *Filartiga v. Pena-Irala,* 630 F.2d 876 (2d Cir.1980) and the three concurring opinions in *Tel-Oren v. Libyan Arab Republic,* 726 F.2d 774 (D.C.Cir.1984), *cert. denied,* 470 U.S. 1003, 105 S.Ct. 1354, 84 L.Ed.2d 377 (1985).

Defendant urges the Court to adopt the reasoning of Judges Bork and Robb in *Tel-Oren, supra,* where the court affirmed the dismissal of a § 1350 tort action against various defendants based on a terrorist attack in Israel by members of the Palestine Liberation Organization. While the three judges concurred in the result, they were unable to agree on the rationale. Judge Bork found that § 1350 constitutes no more than a grant of jurisdiction; that plaintiffs seeking to invoke it must establish a private right of action under either a treaty or the law of nations; and that in the latter category the statute can support jurisdiction at most over only three international crimes recognized in 1789—violation of safe-conducts, infringement of ambassadorial rights, and piracy. *Tel-Oren, supra,* 726 F.2d at 798–823 (Bork, J., concurring). Judge Robb, on the other hand,

found that the dispute involved international political violence and so was "nonjusticiable" within the meaning of the political question doctrine. *Id.* at 823–27 (Robb, Jr., concurring).

The Court is persuaded, however, that the interpretation of § 1350 forwarded by the Second Circuit in *Filartiga, supra,* and largely adopted by Judge Edwards in *Tel-Oren,* is better reasoned and more consistent with principles of international law. There appears to be a growing consensus that § 1350 provides a cause of action for certain "international common law torts." *See, e.g., Filartiga, supra; Tel-Oren, supra* (Edwards, J., concurring); *Guinto v. Marcos,* 654 F.Supp. 276, 279–80 (S.D.Cal. 1986); *Von Dardel v. USSR,* 623 F.Supp. 246, 256–59 (D.D.C.1985) (finding violation under any of the three *Tel-Oren* approaches); *Siderman v. Republic of Argentina,* No. CV 82–1772–RMT(MCx) (C.D. Cal. Sept. 28, 1984), (Lexis, Genfed library, Dist. file). It is unnecessary that plaintiffs establish the existence of an independent, express right of action, since the law of nations clearly does not create or define civil actions, and to require such an explicit grant under international law would effectively nullify that portion of the statute which confers jurisdiction over tort suits involving the law of nations. *See Tel-Oren,* 726 F.2d at 778 (Edwards, J., concurring). Rather, a plaintiff seeking to predicate jurisdiction on the Alien Tort Statute need only plead a "tort ... in violation of the law of nations."

■ The contours of this requirement have been delineated by the *Filartiga* court and by Judge Edwards in *Tel-Oren.* Plaintiffs must plead a violation of the law of nations as it has evolved and exists in its contemporary form.[5] *Filartiga,* 630 F.2d at 881; *Tel-Oren,* 726 F.2d at 777 (Edwards, J., concurring); *Amerada Hess Shipping Corp. v. Argentine Republic,* 830 F.2d 421, 424 (2d Cir.1987). This "international tort" must be one which is definable, obligatory (rather than hortatory),

5. In the opinion of the Court, the international law to be considered is that on which a consen-

sus existed at the time of the alleged violations.

and universally condemned. *Filartiga*, 630 F.2d at 881; *Tel–Oren*, 726 F.2d at 781 (Edwards, J., concurring); *Guinto, supra*, 654 F.Supp. at 279–80; *see also* Blum & Steinhardt, *Federal Jurisdiction over International Human Rights Claims: The Alien Tort Claims Act after* Filartiga v. Pena–Irala, 22 Harv.Int'l. L.J. 53, 87–90 (1981) ["Blum & Steinhardt"]; Schneebaum, *The Enforceability of Customary Norms of Public International Law*, 8 Brooklyn J. Int'l. L. 189, 301–02 (1982). The requirement of international consensus is of paramount importance, for it is that consensus which evinces the willingness of nations to be bound by the particular legal principle, and so can justify the court's exercise of jurisdiction over the international tort claim.

■■■ It is appropriate here to dispose of two arguments advanced by defendant. First, defendant's contention that the law of nations extends only to relations between sovereign states is unsupported. Defendant relies on the Second Circuit's statement in *Dreyfus v. Von Finck*, 534 F.2d 24, 30–31 (2d Cir.), *cert. denied*, 429 U.S. 835, 97 S.Ct. 102, 50 L.Ed.2d 101 (1976), that the law of nations deals "with the relationship among nations rather than individuals." The Second Circuit has expressly disavowed this dictum, at least insofar as it concerns individual injuries under the international law of human rights. *Filartiga*, 630 F.2d at 884; *see also De Sanchez v. Banco Central de Nicaragua*, 770 F.2d 1385, 1396 & n. 15 (5th Cir.1985). Second, it is evident that plaintiffs need not establish that every tort claim alleged constitutes an international tort within the meaning of § 1350. Federal jurisdiction requires the pleading only of one such claim for each plaintiff; principles of pen-

dent and ancillary jurisdiction may provide jurisdiction over the other claims. *United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966); *In re Nucorp Energy Securities Litigation*, 772 F.2d 1486, 1490 (9th Cir.1985).[6]

■ The Court thus interprets 28 U.S.C. § 1350 to provide not merely jurisdiction but a cause of action, with the federal cause of action arising by recognition of certain "international torts" through the vehicle of § 1350. These international torts, violations of current customary international law, are characterized by universal consensus in the international community as to their binding status and their content. That is, they are universal, definable, and obligatory international norms. The Court now examines the allegations of the Complaint to determine whether plaintiffs have stated cognizable international torts for purposes of jurisdiction under § 1350.

*B. Analysis Under 28 U.S.C. § 1350*

In determining whether plaintiffs have stated cognizable claims under Section 1350, the Court has recourse to "the works of jurists, writing professedly on public law; ... the general usage and practice of nations; [and] judicial decisions recognizing and enforcing that law." *United States v. Smith*, 18 U.S. (5 Wheat.) 153, 160–61, 5 L.Ed. 57 (1820). For purposes of defendant's motion to dismiss, the Court must accept as true all of plaintiffs' allegations, construing them in the light most favorable to plaintiffs. *Hall v. City of Santa Barbara*, 797 F.2d 1493, 1496 n. 9 (9th Cir. 1986), *as amended, reh'g denied*, 813 F.2d 198 (9th Cir.1987). The Court may grant dismissal only if it is clear that plaintiffs can prove no set of facts which would entitle them to relief. *Conley v. Gibson*,

---

**6.** The international character of plaintiffs' claims may militate in favor of exercising federal jurisdiction. State common law courts can hear aliens' tort suits under the doctrine of transitory torts, whereby a tort is deemed to "follow" the tortfeasor and so enable a court with personal jurisdiction over him to adjudicate the tort claim. *See* Blum & Steinhardt, *supra*, at 63. It would appear that Congress intended § 1350 to provide concurrent federal jurisdiction over alien tort claims alleging treaty or customary international law violations in order to facilitate federal oversight of matters involving foreign relations and international law. *See Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 427 n. 25, 84 S.Ct. 923, 940 n. 25, 11 L.Ed.2d 804 (1964); *Abdul–Rahman Omar Adra v. Clift*, 195 F.Supp. 857, 865 (D.Md.1961). Such an intent would of course be furthered by the adjudication of alien tort claims in federal district court rather than in a state court of general jurisdiction.

355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957).

### 1. Official Torture

 In Count One, plaintiffs both allege torture conducted by military and police personnel under defendant's command. The Court has no doubt that official torture constitutes a cognizable violation of the law of nations under § 1350. This was the very question addressed by the Second Circuit in *Filartiga, supra.* There, after examining numerous sources of international law, *see Filartiga,* 630 F.2d at 880–84 & n. 16, the court concluded that the law of nations contains a "clear and unambiguous" prohibition of official torture. This proscription is universal, obligatory, and definable. Of course, purely private torture will not normally implicate the law of nations, since there is currently no international consensus regarding torture practiced by non-state actors. *See Tel–Oren,* 726 F.2d at 791–95 (Edwards, J., concurring). Here, however, plaintiffs allege torture by military and police personnel under the supervision and control of defendant while he served as Commander of the First Army Corps. The claim would thus allege torture committed by *state officials* and so fall within the international tort first recognized in *Filartiga.*[7]

 Plaintiffs allege official torture in conclusory terms. Count One incorporates by reference the general allegations set forth in the first 26 paragraphs of the Complaint, and alleges a claim for torture. These allegations probably suffice, for purposes of liberal federal pleading rules, to put defendant on notice of the nature of the claim against him. However, in view of the seriousness of this claim, it is preferable that plaintiffs state the specific acts on which they base the allegation of torture.[8] The Court may treat a Rule 12(b)(6)

dismissal motion as a Rule 12(e) motion for a more definite statement. *See* 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1378, at 773 (1969). Accordingly, the Court orders plaintiffs to amend Count One to state the specific acts on which they base their claim of official torture.

### 2. Prolonged Arbitrary Detention

 In Count Four plaintiffs both allege a claim for prolonged arbitrary detention, stating that defendant "arbitrarily and without justification, cause or privilege, forcibly confined both plaintiff Benchoam and Nelida Azucena Sosa de Forti for a prolonged period." Complaint ¶ 43. Elsewhere plaintiffs allege that Benchoam was imprisoned for more than four years without ever being charged, while Forti's mother was arrested in 1977 but was never charged or released.

There is case law finding sufficient consensus to evince a customary international human rights norm against arbitrary detention. *Rodriguez–Fernandez v. Wilkinson,* 505 F.Supp. 787, 795–98 (D.Kan.1980) (citing international treaties, cases, and commentaries), *aff'd,* 654 F.2d 1382 (10th Cir.1981); *see also De Sanchez, supra,* 770 F.2d at 1397 (right "not to be arbitrarily detained" incorporated into law of nations); *Nguyen Da Yen v. Kissinger,* 528 F.2d 1194, 1201 n. 13 (9th Cir.1975) (illegal detention may constitute international tort) *but see Jean v. Nelson,* 727 F.2d 957, 964 & n. 4 (11th Cir.1984) (disagreed with *Rodriguez–Fernandez* in holding that detention of uninvited aliens under national sovereign's exclusion power is no violation of customary international law), *aff'd,* 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985). The consensus is even clearer in the case of a state's *prolonged* arbitrary detention of its own citizens. *See, e.g., Restatement (Revised) of the Foreign Re-*

---

**7.** The Court rejects defendant's argument that such an allegation of official torture would necessarily implicate the act of state doctrine. *See infra* Section III.

**8.** Plaintiff Forti alleges no facts from which the Court may infer that either he or his mother was tortured. *See* Complaint ¶¶ 10–16. Plain-

tiff Benchoam alleges that she was denied food and clothing for a week; that she was held incommunicado for a month; and that a guard attempted to rape her. Complaint ¶ 18. It is uncertain whether these allegations, standing alone, would be sufficient to constitute an international tort claim for official torture.

*lations Law of the United States* § 702 (Tent. Draft No. 6, 1985) (prolonged arbitrary detention by state constitutes international law violation). The norm is obligatory, and is readily definable in terms of the arbitrary character of the detention. The Court finds that plaintiffs have alleged international tort claims for prolonged arbitrary detention.

### 3. Summary Execution

■ The Second Count alleges plaintiff Benchoam's claim for "murder and summary execution." Benchoam alleges that "[d]efendant's torture, murder, beating and cruel, inhuman and degrading treatment of Ruben Benchoam resulted in and proximately caused his death." Complaint ¶ 32. In support of this claim, plaintiff cites several international documents which proscribe summary execution. Universal Declaration of Human Rights, art. 3, G.A.Res. 217A, U.N. Doc. A/810 (1948); International Covenant on Civil and Political Rights, art. 6, G.A.Res. 2200, 21 U.N. GAOR Supp. (No. 16), U.N.Doc. A/6316 (1966); American Convention on Human Rights, art. 5, OAS Treaty Series No. 36, OAS Off. Rec. OEA/Ser. 4 v/II 23, doc. 21, rev. 2 (English ed. 1975). Similarly, murder—where practiced, encouraged, or condoned by a state— is listed among the international law violations to which Judge Edwards looked for guidance in identifying possible violations of the law of nations. *See Tel–Oren,* 726 F.2d at 781 (quoting *Restatement (Revised) of the Foreign Relations Law of the United States* § 702 (Tent. Draft No. 3, 1982)); *see also Guinto, supra,* 654 F.Supp. at 280. Further, the Fifth Circuit has acknowledged the right not to be murdered [by the state] as among the "basic rights" which "have been generally accepted—and hence incorporated into the law of nations." *De Sanchez, supra,* 770 F.2d at 1397.

The proscription of summary execution or murder by the state appears to be universal, is readily definable, and is of course obligatory. The Court emphasizes that plaintiff's allegations raise no issue as to whether or not the execution was within the lawful exercise of state power; rather, she alleges murder by state officials with neither authorization nor recourse to any process of law. Under these circumstances, the Court finds that plaintiff Benchoam has stated a cognizable claim under § 1350 for the 1977 murder/summary execution of her brother by Argentine military personnel.

### 4. Causing Disappearance

■ In Count Three plaintiff Forti alleges a claim for "causing the disappearance" of his mother, in that defendant "arbitrarily and without justification, cause or privilege, abducted Nelida Azucena Sosa de Forti, held her in secret captivity and caused her 'disappearance' to this day." Complaint ¶ 38.

Sadly, the practice of "disappearing" individuals—i.e., abduction, secret detention, and torture, followed generally by either secret execution or release—during Argentina's "dirty war" is now well documented in the official report of the Argentine National Commission on the Disappeared, *Nunca Mas.* Nor are such practices necessarily restricted to Argentina. With mounting publicity over the years, such conduct has begun to draw censure as a violation of the basic right to life. Plaintiff cites a 1978 United Nations resolution and a 1980 congressional resolution to this effect. U.N.G.A.Res. /173 (1978); H.R.Con. Res. 285, 96th Cong., 2d Sess. The Court notes, too, that the proposed Restatement of the Law of Foreign Relations lists "the murder or causing the disappearance of individuals," where practiced, encouraged, or condoned by the state, as a violation of international law. *Restatement (Revised) of the Foreign Relations Law of the United States,* § 702 (Tent.Draft No. 6, 1985). However, plaintiffs do not cite the Court to any case finding that causing the disappearance of an individual constitutes a violation of the law of nations.

Before this Court may adjudicate a tort claim under § 1350, it must be satisfied that the legal standard it is to apply is one with universal acceptance and definition; on no other basis may the Court exercise jurisdiction over a claimed violation of the

law of nations. Unfortunately, the Court cannot say, on the basis of the evidence submitted, that there yet exists the requisite degree of international concensus which demonstrates a customary international norm. Even if there were greater evidence of universality, there remain definitional problems. It is not clear precisely what conduct falls within the proposed norm, or how this proscription would differ from that of summary execution. The other torts condemned by the international community and discussed above—official torture, prolonged arbitrary detention, and summary execution—involve two types of conduct by the official actor: (1) taking the individual into custody; and (2) committing a wrongful, tortious act in excess of his authority over that person. In the case of "causing disappearance," only the first of these two actions can be proven—the taking into custody. However, the sole act of taking an individual into custody does not suffice to prove conduct which the international community proscribes. The Court recognizes the very real problems of proof presented by the disappearance of an individual following such custody. Yet there is no apparent international consensus as to the additional elements needed to make out a claim for causing the disappearance of an individual. For instance, plaintiffs have not shown that customary international law creates a presumption of causing disappearance upon a showing of prolonged absence after initial custody.

For these reasons the Court must dismiss Count Four for failure to state a claim upon which relief may be grounded.

Accordingly, the Court must dismiss Count Four for failure to state a claim upon which relief may be granted.

### 5. Cruel, Inhuman and Degrading Treatment

■ Finally, in Count Five plaintiffs both allege a claim for "cruel, inhuman and degrading treatment" based on the general allegations of the Complaint and consisting specifically of the alleged torture, murder, forcible disappearance and prolonged arbitrary detention. Complaint ¶¶ 47–48.

This claim suffers the same defects as Count Four. Plaintiffs do not cite, and the Court is not aware of, such evidence of universal consensus regarding the right to be free from "cruel, inhuman and degrading treatment as exists, for example, with respect to official torture." Further, any such right poses problems of definability. The difficulties for a district court in adjudicating such a claim are manifest. Because this right lacks readily ascertainable parameters, it is unclear what behavior falls within the proscription—beyond such obvious torts as are already encompassed by the proscriptions of torture, summary execution and prolonged arbitrary detention. Lacking the requisite elements of universality and definability, this proposed tort cannot qualify as a violation of the law of nations. Accordingly, the Court dismisses Count Five of the Complaint for failure to state a claim upon which relief may be granted.

■ In sum, the Court finds that plaintiffs have stated claims for prolonged arbitrary detention and summary execution. On the other hand, the Court dismisses with prejudice Counts Three ("causing disappearance") and Five ("cruel, inhuman and degrading treatment") for failure to state a claim—i.e., failure to allege a violation of the law of nations cognizable under the Alien Tort Statute. The Court orders plaintiffs to amend Count One; to make a more definite statement of the acts upon which they allege the claim for official torture. It follows from the above statements that this Court has federal subject matter jurisdiction, with respect to both plaintiffs, under 28 U.S.C. § 1350.

### C. Federal Question Jurisdiction

Alternatively, plaintiffs predicate jurisdiction on 28 U.S.C. § 1331, the federal question statute. Section 1331 provides that "[t]he district courts shall have jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." This statute provides jurisdiction over claims founded on federal common law. *Illinois v. City of Milwaukee*, 406 U.S. 91, 100, 92 S.Ct. 1385, 1391, 31 L.Ed.2d

712 (1972); *Textile Workers Union v. Lincoln Mills of Alabama*, 353 U.S. 448, 451, 77 S.Ct. 912, 915, 1 L.Ed.2d 972 (1957).

■ It has long been settled that federal common law incorporates international law. *The Nereide*, 13 U.S. (9 Cranch) 388, 423, 3 L.Ed. 769 (1815); *The Paquete Habana*, 175 U.S. 677, 700, 20 S.Ct. 290, 299, 44 L.Ed. 320 (1900). More recently, the Supreme Court has held that the interpretation of international law is a federal question. *Sabbatino, supra,* 376 U.S. at 415. Thus, a case presenting claims arising under customary international law arises under the laws of the United States for purposes of federal question jurisdiction. *See* 13B C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3563, at 60–63 (2d ed. 1984).

■ The Ninth Circuit recently reviewed the standard for federal question jurisdiction in a case implicating international legal issues. *Republic of Philippines v. Marcos*, 818 F.2d 1473 (9th Cir. 1987). In *Marcos,* plaintiff predicated federal question jurisdiction on its claim that the Marcos government had constituted a RICO enterprise. The court reviewed this jurisdictional claim under an "exceedingly generous" standard on the motion to dismiss: the claim must arise under the Constitution or laws of the United States and must not be "wholly unsubstantial and frivolous." *Marcos, supra,* 818 F.2d at 1477. Applying this standard and assuming the truth of the allegations, the court in *Marcos* found that plaintiff had established jurisdiction. *Id.*

In the instant case plaintiffs' customary international law claims are at least as colorable as the RICO claim in *Marcos.* In the context of defendant's 12(b) motion the Court must assume the veracity of plaintiffs' allegations, which it cannot say are frivolous or insubstantial. Plaintiffs have pleaded jurisdiction under § 1331.

Accordingly, the Court denies defendant's motion to dismiss for lack of jurisdiction. With respect to the allegations under section 1350 the Court denies defendant's motion, to dismiss the entire complaint, but dismisses Counts Three and Five with prejudice, and orders plaintiff to submit a more definite statement of Count One.

## III.

### ACT OF STATE

Defendant next argues that the act of state doctrine bars adjudication of plaintiffs' claims. As defendant notes, most of the conduct complained of occurred during his tenure as Commander of the First Army Corps, between 1977 and 1979. Defendant maintains that all of the challenged acts were taken pursuant to the "state of siege" declared by the constitutional government and reaffirmed by the military junta. Thus, defendant argues, he was a government official acting under policies promulgated by the junta, and this Court cannot adjudicate the question of his liability without also passing on the question of the legality of the acts of the Argentine government. This, he concludes, is precisely the sort of case which the act of state doctrine removes from the courts' scrutiny.

■ As the parties agree, defendant bears the burden of establishing the applicability of the act of state doctrine. *Alfred Dunhill of London, Inc. v. Republic of Cuba,* 425 U.S. 682, 694 n. 10, 96 S.Ct. 1854, 1861, n. 10, 48 L.Ed.2d 301 (1976); *Marcos, supra,* 818 F.2d at 1482 n. 6; *Republic of Philippines v. Marcos,* 806 F.2d 344, 359 (2d Cir.1986) *cert. dismissed,* —— U.S. ——, 107 S.Ct. 1597, 94 L.Ed.2d 784 (1987), *cert. denied,* —— U.S. ——, 107 S.Ct. 2178, 95 L.Ed.2d 835 (1987). For the reasons set forth below, the Court finds that defendant has failed to meet his burden.

The act of state doctrine emerged in the jurisprudence of the United States at least as early as the eighteenth century. The classic American statement of the doctrine appears in *Underhill v. Hernandez,* 168 U.S. 250, 18 S.Ct. 83, 42 L.Ed. 456 (1897), where an American citizen attempted to sue for alleged tortious conduct committed in Venezuela by an Army commander acting under the revolutionary government of Venezuela. Holding that the action was

barred by the act of state doctrine, the *Underhill* Court stated:

> Every sovereign State is bound to respect the independence of every other sovereign State, and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory. Redress of grievances by reason of such acts must be obtained through the means open to be availed of by sovereign powers as between themselves.

*Id.* at 252, 18 S.Ct. at 84. United States courts have consistently reaffirmed this basic statement of the doctrine. *See, e.g., Marcos, supra,* 818 F.2d at 1481 & n. 4.

More recently, however, the Supreme Court reexamined and reworked the doctrine in a trilogy of cases arising out of Cuban expropriations of American assets. In the leading case of *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964) the United States Supreme Court held that the act of state doctrine applies even to violations of international law. The *Sabbatino* Court explained that neither the inherent nature of sovereign authority nor any principle of international law compels adherence to the doctrine; rather, it rests on "constitutional underpinnings" governing the proper distribution of power among the branches of government. *Id.* at 423, 84 S.Ct. at 938. To ensure such a proper distribution in matters affecting foreign relations, the Court articulated a three-part test for determining whether application of the doctrine is called for. Under this rule, the court must balance the degree of codification or consensus regarding the international legal principle in question, the impact of the matter on United States foreign relations, and the status of the foreign government whose act is allegedly implicated. *Id.* at 428, 84 S.Ct. at 940. As the *Sabbatino* Court stated:

> It should be apparent that the greater the degree of codification or consensus concerning a particular area of international law, the more appropriate it is for the judiciary to render decisions regarding it, since the courts can then focus on the application of an agreed principle to circumstances of fact rather than on the sensitive task of establishing a principle not inconsistent with the national interest or with international justice. It is also evident that some aspects of international law touch much more sharply on national nerves than do others; 'the less important the implications of an issue are for our foreign relations, the weaker the justification for exclusivity in the political branches.

*Id.*

Subsequently, in *First National City Bank v. Banco Nacional de Cuba,* 406 U.S. 759, 92 S.Ct. 1808, 32 L.Ed.2d 466 (1972), the court declined to apply the doctrine to a counterclaim against Cuba's national bank. Although the court could not agree on the precise rationale, five Justices in three opinions found that the act of state doctrine did not preclude a counterclaim where the executive had suggested that the doctrine not be applied, where no showing was made that adjudication would interfere with the conduct of foreign relations, and where the counterclaim was asserted as a set-off not exceeding the value of plaintiff's claim.

Finally, a plurality of the Court in *Alfred Dunhill of London, Inc. v. Republic of Cuba,* 425 U.S. 682, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976) declined to apply the doctrine where the government interventors of nationalized American businesses denied liability and refused to repay sums mistakenly paid by importers. The plurality specified that the act of state doctrine applies only to acts which are both "public" and "governmental" in nature. *Id.* at 695, 96 S.Ct. at 1862.

Defendant cites the recent Ninth Circuit opinion in *Marcos, supra,* as controlling precedent. He fails to consider that *Marcos* is distinguishable on its facts. In *Marcos,* the current government of the Philippines sought to recover funds which it alleged former Philippine President Marcos and his wife had obtained illegally. Plaintiff Republic of the Philippines alleged that the entire government under President Marcos had constituted a criminal "enter-

prise" within the meaning of the Racketeer Influenced and Corrupt Organizations (RICO) statute, 18 U.S.C. §§ 1961–1968. In support of its claims plaintiff advanced a net worth theory which depended entirely on plaintiff's being able to prove that virtually all of the Marcoses' wealth had been obtained illegally. *Marcos,* 818 F.2d at 1480. The claims thus involved a challenge to the acts of a foreign head of state and were inextricably bound up with allegations that the entire government had operated as a criminal enterprise under United States law. As the Ninth Circuit recognized, it would be impossible for the federal court to adjudicate these claims without ruling on the legality of official government acts of the foreign sovereign. *Id.* at 1482.

Here, by contrast, plaintiffs allege acts by a subordinate government official in violation not of economic rights, but of fundamental human rights lying at the very heart of the individual's existence. These are not the public official acts of a head of government, nor is it clear at this stage of the proceedings to what extent defendant's acts were "ratified" by the *de facto* military government. Further, plaintiffs have submitted evidence that the acts, if committed, were illegal even under Argentine law at all relevant times. Garro Declaration ¶¶ 13–17. It may thus result that the Court's inquiry will be directed to the factual question whether certain acts were committed, rather than to the legality of those acts under Argentine law.

 The Court finds unpersuasive defendant's attempts to bring his case within the facts of either *Marcos, supra,* or *Underhill, supra.*[9] Equally unpersuasive is defendant's argument that allegations of "official" conduct sufficient to establish jurisdiction under 28 U.S.C. § 1350 automatically implicate the act of state doctrine. Claims for tortious conduct of

government officials under 28 U.S.C. § 1350 may be analogized to domestic lawsuits brought under 42 U.S.C. § 1983, where plaintiffs must allege both deprivation of a federally protected right and action "under color of" state law. So, too, for purposes of § 1350 a plaintiff must allege "official" (as opposed to private) action—but this is not necessarily the governmental and public action contemplated by the act of state doctrine. That is, a police chief who tortures, or orders to be tortured, prisoners in his custody fulfills the requirement that his action be "official" simply by virtue of his position and the circumstances of the act; his conduct may be wholly unratified by his government and even proscribed by its constitution and criminal statutes. *See Filartiga,* 630 F.2d at 889; *on remand, Filartiga v. Penna–Irala,* 577 F.Supp. 860, 862 (E.D.N.Y.1984). Thus, allegations of official action for purposes of § 1350 do not *necessarily* require application of the act of state doctrine. Indeed, since violations of the law of nations virtually all involve acts practiced, encouraged or condoned by states, defendant's argument would in effect preclude litigation under § 1350 for "tort[s] ... committed in violation of the law of nations."

The procedural context of defendant's motion governs here. Inasmuch as this is a Rule 12(b)(6) motion, the Court must accept as true the allegations of the Complaint, and may not dismiss the Complaint unless plaintiffs can prove no set of facts to establish their claims. *Conley, supra,* 355 U.S. at 45–46, 78 S.Ct. at 101–102; *Hall, supra,* 797 F.2d at 1496 n. 9. The Court cannot say at this stage of the proceedings that adjudication of plaintiffs' claims will necessarily entail considering the legality of the official acts of a foreign sovereign. *See Liu v. Republic of China,* 642 F.Supp. 297, 303 (N.D.Cal.1986). Be-

---

9. Nor does he provide an adequate analysis of the *Sabbatino* factors. Defendant's failure to meet his threshold burden of establishing the applicability of the act of state doctrine makes it unnecessary to proceed to an analysis of the *Sabbatino* factors. *See Ramirez de Arellano v. Weinberger,* 745 F.2d 1500, 1534 (D.C.Cir.1984)

(en banc) (movant must make a "factual showing that an act of state has occurred, coupled with a legal showing that no bar to the doctrine is applicable under the factual circumstances"), *vacated on other grounds,* 471 U.S. 1113, 105 S.Ct. 2353, 86 L.Ed.2d 255 (1985).

cause it is not clear that the concerns implicated by the act of state doctrine are here present, the Court must deny defendant's motion to the extent that it is based on the act of state doctrine.

## IV.

### STATUTE OF LIMITATIONS

▮▮▮▮ Congress did not provide a statute of limitations for claims brought pursuant to 28 U.S.C. § 1350. When a federal statute provides a civil cause of action but includes no express limitations period, courts must generally borrow the most analogous state statute. *See, e.g., Wilson v. Garcia,* 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985) (state limitations period for personal injury claims applicable to 42 U.S.C. § 1983 claims). However, state statutes of limitations are not to be borrowed blindly. At times the application of state rules may fail to advance the legislative purpose of the federal law. In limited circumstances, where a rule from elsewhere in federal law provides a closer analogy than available state statutes, and better accomodates federal policies and the practicalities of litigation, a federal limitations period may better bridge the gap left open by Congress. *See Agency Holding Corp. v. Malley–Duff & Assoc. Inc.,* —— U.S. ——, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987) (limitations period of federal antitrust statutes adopted to limit civil RICO actions).

▮▮▮▮ Plaintiffs request that the Court look to federal law for the most analogous limitations period, or to California state law. The most analogous federal rule of timeliness of a claim, plaintiffs argue, is that provided for by the Jones Act or by case interpreting maritime and admiralty law.[10] Defendant urges the Court to adopt the law of Argentina, as it is the state in which the events underlying plaintiffs' claims took place.[11]

▮▮▮ To determine whether to apply a federal or state limitations period, the Court must first identify the closest analogies under both federal and state law. As discussed above actionable claims under the Alien Tort Statute involve harm to the person that is universally recognized in international law as unjustified conduct. The types of claims found by this Court to be actionable under 28 U.S.C. § 1350—official torture, prolonged arbitrary detention, and summary execution— seek damages for personal injuries and sound in tort. Thus the closest analogy in state law is the recovery of damages for personal injuries.

The closest analogy in federal law is not as easily ascertained, and depends in large part upon determining the most important characteristic of a claim under 28 U.S.C.

---

**10.** In addition, plaintiffs contend that the Court should apply the limitations principles of international law to plaintiffs' claims under the terms of the Alien Tort Statute. Plaintiffs assert that the limitations rules of international law requires determining whether a case is time-barred by examining its facts. Thus, there is no statute of limitations under international law. The Court's ruling that the federal statute provides the right of action to sue for violations of customary international law militates against directly adopting the limitations rules of international law. While international law provides the substantive standard of culpable conduct for claims brought under 28 U.S.C. § 1350, the cause of action itself is created by the federal statute. Plaintiffs have presented no theory as to why this statutory grant of a cause of action should be treated differently, in terms of adopting the applicable limitations period, than any other federal statute that grants a right of action but no limitations period.

Neither have plaintiffs presented a persuasive argument for adopting international law as the most analogous federal law. Although international law itself is a part of our federal common law, *see, supra* section II.C., there is no indication in the statutory scheme Congress has created for redressing violations of international law, that Congress intended to adopt a case-by-case approach to determining the timeliness of claims under 28 U.S.C. § 1350. Adopting such a rule would be tantamount to permitting the federal claim to be brought at any time. Such a rule has repeatedly been rejected by the United States Supreme Court as " 'utterly repugnant to the genius of our laws.' " *Wilson v. Garcia, supra,* 471 U.S. at 271, 105 S.Ct. at 1944 (quoting, *Adams v. Woods,* 6 U.S. [2 Cranch] 336, 341, 2 L.Ed. 297 (1805)).

**11.** Although plaintiffs dispute the applicability of Argentine law, they agree with defendant that the limitations period under Argentine law for tort claims is two years.

§ 1350 for purposes of applying an appropriate limitations period. Title 28 U.S.C. § 1350, as interpreted by this Court, provides a unique federal remedy. It grants to non-United States citizens a remedy for personal harm of rights recognized by customary international law. The harms for which liability attaches constitute conduct clearly sounding in tort. Two other federal statutory schemes share additional distinctive characteristics with 28 U.S.C. § 1350 in addition to redressing injuries that sound in tort. The Jones Act, 46 U.S.C. § 688, under which seamen suffering personal injury in the course of employment may sue for damages in federal court, provides a claim and access to federal courts, to the same class of plaintiffs as 28 U.S.C. § 1350, non-United States citizens. The Jones Act provides that "all statutes of the United States conferring or regulating the right of action for death in the case of railway employees" shall be applicable to claims under the Jones Act. 46 U.S.C. § 688(a). Thus the three year limitations period of the Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 56, is applied to Jones Act claims. The adoption of the FELA statute of limitations demonstrates Congress' intention to treat Jones Act claims as claims of employees against their employers. However, the statute of limitations rule under the Jones Act does not emphasize the nature of the claim as one under which aliens can sue. Instead it addresses itself to the question of how long employers must remain responsible for conduct causing injury to their employees. By addressing personal injury claims specifically where an employer is the wrongdoer, the limitations rule of the Jones Act is less analogous than state law rules for personal injury actions. Under the Alien Tort Statute the wrongdoers are individuals acting under the color of governmental authority and in their capacity as government officials.

A second federal statutory scheme, the Civil Rights Act of 1871, is analogous to the Alien Tort Statute in respect to both the nature of the harm alleged, and the class of individuals responsible for the harm. The Civil Rights Act provides for damages for the deprivation of rights secured by the United States Constitution and federal laws incurred by individuals acting under color of state law. Like 28 U.S.C. § 1350, it imposes a standard that government officers must adhere to and provides a right to damages for violation of that standard. However, the Civil Rights Act does not contain an express limitations period. Federal law borrows the limitations period for personal injury actions provided by state law for claims under 42 U.S.C. § 1983. *Wilson v. Garcia, supra,* 471 U.S. at 276, 105 S.Ct. at 1947. In applying state law limitations periods for tort actions to limit 42 U.S.C. § 1983 actions, the Supreme Court relied upon the fact that 42 U.S.C. § 1983 redresses harm to the person, and includes a provision directing federal courts to apply state law where no suitable federal law exists in adjudicating civil rights claims, 42 U.S.C. § 1988.

 In the opinion of the Court, the federal statute most analogous to 28 U.S.C. § 1350 is 42 U.S.C. § 1983. Since the most analogous federal law itself applies the state law limitations period that is analogous to claims under the Alien Tort Statute, there is no compelling reason to "look beyond" state law for a limitations period. The Court holds that the state law limitations period for personal injury actions applies to claims under 28 U.S.C. § 1350. The remaining question is whether the applicable state law is that of the foreign state in which the conduct causing the injury occurred, or that of the forum state. Since the Alien Tort Statute is a highly remedial statute, the limitations rule adopted should promote the policy of providing a forum for claims of violations of internationally recognized human rights. The effectiveness of this remedial scheme could be greatly weakened if the law of the foreign nation in which the conduct occurred governed the limitations period. By restricting the limitations period for personal injury claims, foreign states could effectively prevent their nationals from bringing claims under the Alien Tort Statute. Additionally, the practicalities of determining the limitations period on a per-

sonal injury claim under foreign law are daunting, especially where the foreign nation's concepts of limitations of actions and of tortious conduct drastically diverge from those of the law of the United States. Finally, the use of a limitations period of a foreign nation does not promote uniformity. While the limitations period of the different states in the United States do vary, they are relatively uniform and easily ascertainable.

Accordingly, in the opinion of the Court, the statute of limitations of the forum state for personal injury actions should be applied to claims under the Alien Tort Claims Act. Under California law, personal injury actions must be brought within one year of the conduct causing the injury. Cal.Code Civ.Proc. § 340(3). The alleged wrongful conduct for which plaintiff Forti seeks relief occurred on February 18, 1977. Plaintiff Benchoam seeks relief for conduct occurring on July 25, 1977, and for her detention, which continued through November 5, 1981. The Complaint was filed in April 1987. To demonstrate that their claims are not time-barred plaintiffs must allege facts sufficient to show a disputed question of fact as to timeliness, but need not plead specific factual detail not ascertainable without discovery. *Gibson v. United States*, 781 F.2d 1334, 1340 (9th Cir.1986) *cert. denied*, — U.S. —, 107 S.Ct. 928, 93 L.Ed.2d 979 (1987).

Plaintiffs rely upon principles of equitable tolling of the statute of limitations to raise an issue of fact as to timelinees. Although the limitations period of a claim under the Alien Tort Statute is governed by state law, because the claim itself is a federal claim, federal equitable tolling doctrines apply. *Cf. Gibson v. United States, supra,* 781 F.2d at 1340 (federal law governs accrual of a federal claim even where a state statute applies the limitations period); *Holmberg v. Almbrecht,* 327 U.S. 392, 66 S.Ct. 582, 90 L.Ed. 743 (general principle of equitable tolling applied to federal claim borrowing state limitations period); *Cohen v. Board of Educ. of East Ramapo Cent. School Dist.,* 536 F.Supp. 486, 495 (S.D.N.Y.1982) (state tolling doc-

trines apply to federal claims borrowing state limitations periods only when federal law fails to provide a solution).

Although statutes of limitations are designed "to assure fairness to defendants," flexibility in applying a limitations period to bar actions is necessary to further the interests of justice. *Burnett v. New York Central R.R. Co.,* 380 U.S. 424, 428, 85 S.Ct. 1050, 1054, 13 L.Ed.2d 941 (1965). Accordingly, federal law recognizes and applies principles of equitable tolling of statutes of limitations to every federal claim. *See, e.g., Holmberg v. Armbrecht, supra,* 327 U.S. at 397, 66 S.Ct. at 585. Equitable tolling occurs under federal law in two types of situations: (1) where defendant's wrongful conduct prevented plaintiff from timely asserting his claim; or (2) where extraordinary circumstances outside plaintiffs' control make it impossible for plaintiff to timely assert his claim.

The equitable tolling doctrine most often applied is that enunciated in *Holmberg v. Armbrecht, supra.* When a plaintiff remains in ignorance of the facts of his claim through defendants' fraudulent concealment of those facts, without any fault of lack of due diligence of plaintiffs' part, the limitations period is tolled until the discovery of defendant's fraud. *Id.* at 396–97, 66 S.Ct. at 584–85. Although the "fraudulent concealment" doctrine applies only to defendant's conduct in concealing facts essential to plaintiff's claim, the principle underlying this doctrine applies equally to situations where a defendant flees and conceals himself for the purpose of avoiding liability for the acts at issue in plaintiff's suit. Equity does not lend itself to fraud of any kind. *Id.* at 396, 66 S.Ct. at 584. Where a defendant conceals himself in order to escape liability for the culpable conduct alleged by plaintiff, his conduct may be regarded as fraudulently contriving to conceal himself for the purpose of having the limitations period run. *Cf. Stewart v. Stewart,* 152 Cal. 162, 92 P. 87 (1907) (defendant who clandestinely visits California after an absence, is considered absent during the period of the visit for purposes of a state statute excluding the period of a

defendant's absence from the state from the limitations period). Accordingly, the time defendant Suarez–Mason was "in hiding" may be excluded from the limitations period absent evidence that, in exercising due diligence, plaintiffs would have discovered his whereabouts. The Complaint alleges that Suarez–Mason fled Argentina sometime after January 1984 and before March 1984, and was in hiding until January 1987, when he was arrested by Federal Marshals in Foster City, California. These allegations suffice to raise an issue of fact regarding the equitable tolling of the limitations period for approximately three years, from January or March 1984, to January 1987.[12]

■ Federal courts have also applied a theory of equitable tolling similar to an "impossibility" doctrine. Where extraordinary events which are beyond plaintiff's control prevent a plaintiff from bringing his claim, the limitations period is tolled until the barrier caused by these events is removed. This theory was applied in *Osbourne v. United States*, 164 F.2d 767 (2d Cir.1947), where the court held that plaintiff's internment by Japan during World War II tolled the limitations period on his claim under the Jones Act against his employer for injury occurring immediately prior to his internment. *See also Hanger v. Abbott*, 73 U.S. [6 Wall.] 532, 18 L.Ed. 939 (1867) (the Civil War tolled the limitations period for a breach of contract claim until the restoration of peace). The *Osbourne* court relied upon the principle that plaintiff's failure to bring a timely claim was not cause by a lack of due diligence on his part, but by external forces. In finding that the circumstances were sufficiently extraordinary to deviate from the usual rule, the court stated:

All statutes of limitations are based on the assumption that one with a good cause of action will not delay in bringing it for an unreasonable period of time; but, when a plaintiff has been denied

access to the courts, the basis of the assumption has been destroyed.

164 F.2d at 769. Additionally, where the defendant is aware of the circumstances causing the lack of access to the courts, he is not prejudiced by the tolling of the statute of limitations.

■ Plaintiffs claim that it was impossible for them to gain relief for defendant's wrongdoing in the courts of Argentina from the time their claims accrued until the demoncratically-elected government assumed power. As defendant points out, plaintiffs were not actually denied access to the Argentine courts. Nominally, the Argentine courts retained their powers to adjudicate civil claims against military officers and to grant habeas relief. As a practical matter, however, access to Argentine courts may have been denied to plaintiffs. Plaintiffs present facts indicating that the court retained of its powers over the military in form only and that effectively, no relief was or could be granted by the Argentine courts. Additionally, given the pervasiveness of the military's reign of terror, it may be possible for plaintiffs to demonstrate that members of the judiciary neglected to apply laws granting relief out of fear of becoming the next victim of the "dirty war." At this stage of the litigation the Court cannot rule that plaintiffs will be unable to prove that they were denied effective access to the Argentine courts prior to January 1984. Accordingly, plaintiffs have raised an issue of fact as to whether the limitations period was tolled for the period prior to January 1984 due to plaintiffs' inability to gain effective access to the Argentine courts.

Plaintiffs filed this action in April 1987. In light of plaintiffs allegations raising issues of equitable tolling as to the period from 1977 to 1984, and from approximately January 1984 to January 1987, defendant has failed to demonstrate that plaintiffs'

12. Additionally, the limitations period is tolled as to plaintiff Forti from November 1983 until the time he filed this action under the equitable tolling doctrine excluding the time during

which plaintiff pursued his claim in a separate court action. *See Burnett v. New York Central R.R. Co., supra,* 380 U.S. at 428–29, 85 S.Ct. at 1054–55.

claims are untimely. The Court declines to dismiss the federal claims as time-barred.[13]

## V.

### INDISPENSABLE PARTIES

■ Defendant also moves to dismiss under Federal Rule of Civil Procedure 19(b), arguing that his superiors in the military are indispensable parties to this litigation whose joinder is not feasible because their presence would render plaintiffs' claims nonjusticiable. Defendant's argument rests on the allegation that any actions he took with regard to the events described in the Complaint were taken under order of his superiors in the government. Plaintiffs counter that this allegation is unsupported, and that at most it only indicates that the unjoined military officers are joint tortfeasors. Plaintiffs argue that a tort claim against one of several joint tortfeasors may be adjudicated without the presence of the other wrongdoers.

A party is necessary to litigation where either in his absence complete relief cannot be accorded among the parties, or the person claims an interest in the subject of the action and either without being present his ability to protect that interest would be impaired, or by reasons of that claimed interest the absent party would be subject to risk of multiple suits or inconsistent obligations. Fed.R.Civ.P. 19(a). If such a party is necessary but cannot be joined, the Court is to determine whether "in equity and good conscience" the action should proceed or be dismissed. Fed.R.Civ.P. 19(b). Rule 19 is designed to protect the absentee from prejudice, to protect the parties from harassment by successive suits, and to protect the courts from duplicative litigation. *Criswell v. Western Airlines, Inc.*, 709 F.2d 544, 557 (9th Cir.1983).

Here, the unnamed superior officers who defendant contends are indispensable parties do not have any interest in the litigation that requires protection. In this respect the present case is distinguishable

from the sole case upon which defendant relies, *Krug v. Fox*, 161 F.2d 1013 (4th Cir.1947). There the court was asked by the former operating manager of a coal mine to restrain the Secretary of the Interior from exercising proprietary rights to the mine and from providing mandatory regulations for its operation. In finding that the federal government was a necessary party to the suit, the court determined that the coal mine was lawfully in the possession of the federal government. 161 F.2d at 1018. Thus, in *Krug v. Fox* the federal government's presence was needed to protect its possessory interest in the subject matter of the litigation. In the case at bar no such interest is implicated by subject matter of the litigation.

Defendant urges the Court to dismiss the Complaint on the basis of his allegation that any challenged actions were taken pursuant to orders from his superiors in the Argentine government. Defendant argues that *Krug v. Fox* establishes a rule that whenever a plaintiff challenges the conduct of a government official acting under orders of a superior in the government, the government itself is an indispensable party to the suit. Defendant overlooks the fact that the defendant in *Krug v. Fox*, the Secretary of the Interior, demonstrated that he had performed the challenged act under a direct, express order of the President of the United States. Defendant here presents no evidence that his acts were of such a nature. Additionally, the *Krug v. Fox* court held that the presidential power authorizing the seizure of the coal mine was lawfully exercised. In the present case the lawful nature of the alleged acts is in dispute. Finally, as discussed above, *Krug v. Fox* involved a possessory interest in the subject property which could not be adequately protected in the government's absence. Here, the defense that defendant acted pursuant to a direct, lawful govern-

**13.** Neither are plaintiffs' pendent state law claims timebarred on the face of the Complaint because California law applies equitable tolling principles similar to those discussed herein.

*See Stewart v. Stewart, supra; see also Lewis v. Superior Court,* 175 Cal.App.3d 366, 380, 220 Cal.Rptr. 594 (1985).

ment order can be determined in the absence of the Argentine government.[14]

██ Absent an interest in the litigation, a government superior who allegedly issued an order to perform the challenged action is merely a potential joint tortfeasor. A joint tortfeasor is not a "necessary" party within the meaning of Rule 19. He is "merely a permissive party to an action against another with like liability," and therefore his joinder is governed not by Rule 19, but by Rule 20. Advisory Committee Notes to Fed.R.Civ.P. 19.

Defendant has failed to demonstrate that the unnamed military officers who were his superiors are necessary parties to this litigation. Thus they cannot be indispensable to the adjudication of plaintiff's claims, and defendant's request for dismissal pursuant to Rule 19 is denied.

██ Defendant requests that the Court dismiss Count Ten of the Complaint in which plaintiff Benchoam alleges a pendent state law survival claim on behalf of her brother Ruben. Plaintiff Benchoam acknowledges that she cannot maintain such an action and does not object to dismissal of this claim. Accordingly, Count Ten is dismissed, with prejudice.

██ Defendant requests, in the event that the entire Complaint is not dismissed, that this action be stayed until the extradition proceedings are completed. In the opinion of the Court, defendant has shown sufficient hardship to merit a temporary stay. However, such hardship exists only while the defense prepares for the extradition proceedings. Accordingly, the Court grants a temporary stay until further order of the Court following the submission of the extradition request.

Accordingly, for the reasons set for above, IT IS ORDERED that:

1. Defendant's motion to dismiss for lack of subject matter jurisdiction is DENIED.

2. Defendant's motion to dismiss for failure to state a claim is DENIED in part and GRANTED in part. Counts Three and Five are dismissed with prejudice.

3. Plaintiffs shall amend Count One to provide a more definite statement of the claim. They are directed to allege the specific upon which they base their claim of official torture.

4. Defendant's motion to dismiss plaintiffs' claims as time-barred is DENIED.

5. Defendant's motion to dismiss for failure to join indispensable parties is DENIED.

6. Defendant's motion to dismiss Count Ten (survival claim brought by Benchoam) is GRANTED.

7. Defendant's motion to stay the action is GRANTED pending further order of this Court upon the submission of the extradition matter.

8. Plaintiffs shall file their First Amended Complaint no later than thirty (30) days from the date of this Order.

IT IS SO ORDERED.

---

14. If in fact defendant proves that he acted pursuant to direct orders he may be able to meet his burden to establish that the Act of State doctrine prevents the Court from adjudicating plaintiffs' claims. However, as explained in section III, *supra,* he has not met his burden on that issue at this time.