[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

**FILED**

**U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
January 4, 2006
THOMAS K. KAHN
CLERK**

_____

No. 02-14427

_____

D.C. Docket No. 99-08364-CV-DTKH

JUAN ROMAGOZA ARCE,
NERIS GONZALEZ,
and CARLOS MAURICIO,

Plaintiffs-Appellees,

versus

JOSE GUILLERMO GARCIA,
an individual,
CARLOS EUGENIO VIDES CASANOVA,
an individual,

Defendants-Appellants.

_____

Appeal from the United States District Court
Southern District of Florida

_____

**(January 4, 2006)**

Before TJOFLAT and CARNES, Circuit Judges, and CONWAY*, District Judge.

_____

* Honorable Anne C. Conway, United States District Judge for the Middle District of
Florida, sitting by designation.

TJOFLAT, Circuit Judge:

On its own motion, entered on August 5, 2005, the court vacated its opinion issued on February 28, 2005, in Arce v. Garcia, 400 F.3d 1340. We substitute the following as the opinion of the court:

The three plaintiffs in this case are Salvadoran refugees who were allegedly tortured by military personnel in El Salvador during a campaign of human rights violations by the Salvadoran military from 1979 to 1983; the two defendants were leaders in the Salvadoran military. All of the plaintiffs sought compensatory and punitive damages under the Torture Victim Protection Act ("TVPA"), 28 U.S.C. § 1350 note;[1] two plaintiffs sought the same relief under the Alien Tort Claims Act ("ATCA"), 28 U.S.C. § 1350.[2] A jury awarded the plaintiffs a total of $54,600,000, and the court entered judgments accordingly. The defendants now appeal, contending that the statute of limitations bars the plaintiffs' claims. We

---

[1] The TVPA provides, in relevant part:
(a) Liability.–An individual who, under actual or apparent authority, or color of law of any foreign nation–
　　　(1) subjects an individual to torture shall, in a civil action, be liable for damages to that individual . . . .
28 U.S.C. § 1350 note.

[2] The ATCA grants district courts "original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. The ATCA is a jurisdictional statute that does not, in itself, create a cause of action. Sosa v. Alvarez-Machain, 542 U.S. 692, 724, 124 S. Ct. 2739, 2761, 159 L. Ed. 2d 718 (2004).

conclude, based on the doctrine of equitable tolling, that the claims are not time-barred.

I.

The plaintiffs in this case are Juan Romagoza Arce, Neris Gonzalez, and Carlos Mauricio. Arce, a physician, was allegedly kidnaped by Salvadoran soldiers on or about December 12, 1980 and tortured for approximately twenty-two days; he arrived in the United States in 1983. Gonzalez, a lay worker with the Catholic Church, was allegedly abducted by Salvadoran soldiers on December 26, 1979 and tortured for approximately twelve days; she came to the United States in 1997. Mauricio, a college professor, was allegedly kidnaped on June 13, 1983 and tortured for approximately ten days at the National Police Headquarters; he came to the United States in 1983.

The defendants in this case are Jose Garcia and Carlos Vides Casanova. Garcia served as Minister of Defense of El Salvador from 1979 to 1983, and Casanova served as Director General of the El Salvador National Guard during the same period. After Garcia resigned as Minister of Defense in 1983, Casanova was appointed as his successor and held the position of Minister of Defense until he resigned in 1989. Both defendants became permanent residents of the United States in 1989, Casanova in August and Garcia in October.

II.

A.

Arce and Gonzalez[3] commenced this action against Garcia and Casanova on May 11, 1999, by filing in the United States District Court for the Southern District of Florida a nine-count complaint seeking compensatory and punitive damages for torture they allegedly suffered at the hands of Salvadoran military personnel under the defendants' command. They invoked the court's jurisdiction under the ATCA, by claiming that the torture had been administered in violation of the law of nations and treaties of the United States,[4] and 28 U.S.C. § 1331, by claiming that the torture was actionable under the TVPA. On November 12, 1999, they moved the court for leave to amend their complaint, in conformance with the amended complaint attached to their motion, to add as parties plaintiff Mauricio[5] and Jorge Montes. On December 22, 1999, the court granted the motion

---

[3] Gonzalez initially appeared under the pseudonym "Jane Doe." Gonzalez used her real name in the second amended complaint and all pleadings subsequent thereto.

[4] As noted, supra note 2, only aliens are authorized to bring suit under the ATCA. Arce sued under the ATCA even though he was naturalized citizen of the United States.

[5] Mauricio appeared under the pseudonym "John Doe," and sought damages only against Casanova. In his subsequent pleadings, Mauricio used his real name.

and, at the same time, dismissed on its own initiative the proposed amended

complaint because it failed to comply with the Rules of Civil Procedure.[6]

On February 17, 2000, the plaintiffs, now consisting of Arce, Gonzalez,

Mauricio, and Montes, having been granted leave to do so, filed a second amended

complaint (hereafter the "complaint").  Like the initial complaint, it consisted of

nine counts, each containing multiple claims for compensatory and punitive

damages.  The first count was brought by all of the plaintiffs under the TVPA.

The remaining counts, in which Arce, not being an alien, did not join, were

brought by Gonzalez, Mauricio, and Montes[7] under the ATCA.[8]  Garcia and

---

[6]  See Fed. R. Civ. P. 8(a) ("A pleading . . . shall contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief . . . ."); Fed. R. Civ. P. 10(b) ("Each claim founded upon a separate transaction or occurrence . . . shall be stated in a separate count . . . whenever a separation facilitates the clear presentation of the matters set forth.").  The plaintiffs' initial complaint was composed of 164 paragraphs, and each of its nine counts contained more than one claim. The amended complaint contained 85 paragraphs and four counts.  Each count asserted multiple claims under essentially the same legal theories as the initial complaint.  The third and fourth counts also invoked the court's jurisdiction under 28 U.S.C. § 1367 (supplemental jurisdiction) and 28 U.S.C. § 1332 (diversity jurisdiction) and sought relief under (unidentified) statutes and common law of Florida and (unidentified) laws of El Salvador.

[7]  While the case was in the pleading stage, Montes obtained a voluntary dismissal of his claims.

[8]  The second amended complaint omitted the claims based on the laws of Florida and El Salvador asserted in the third and fourth counts of the amended complaint.  As before, this complaint invoked the court's jurisdiction under the ATCA for the plaintiffs' (except Arce's) claims that the subject torture had occurred in violation of the law of nations and treaties of the United States.  In the first count, this complaint also sought damages under the TVPA.  As noted supra, the initial and amended complaints cited 28 U.S.C. § 1331 as the jurisdictional basis for the TVPA count.  The second amended complaint failed to cite § 1331 as the jurisdictional basis

5

Casanova answered the second amended complaint,[9] denying liability and asserting several affirmative defenses, including the statute of limitations defense, the focus of this appeal.[10]

B.

The question of whether the statute of limitations barred the plaintiffs' claims was presented to the district court on several occasions prior to trial. The defendants raised the defense in motions to dismiss[11] and for judgment on the pleadings. The court denied each motion, concluding that the complaint contained allegations of fact sufficient to make out a case for equitable tolling so as to make

---

for the first count; rather, it cited the TVPA as the jurisdictional source. The TVPA contains no jurisdictional provision. The omission of a jurisdictional basis for the first count is not fatal, however, for we assume jurisdiction under § 1331 when it appears that a complaint's allegations state a cause of action under federal law. See Lykins v. Pointer, Inc., 725 F.2d 645, 646 (11th Cir. 1984) ("The law of this circuit . . . is that 'where a complaint fails to cite the statute conferring jurisdiction, the omission will not defeat jurisdiction if the facts alleged in the complaint satisfy the jurisdictional requirements of the statute.'" (quoting Hildebrand v. Honeywell, Inc., 622 F.2d 179, 181 (5th Cir. 1980))).

[9] After answering the second amended complaint, the defendants filed an amended answer. The amended answer asserted several affirmative defenses, including the statute of limitations. We treat the answer and amended answer as one and the same.

[10] The other affirmative defenses are therefore irrelevant.

[11] The defendants moved the court to dismiss the plaintiffs' claims both before and after answering the second amended complaint.

the plaintiffs' claims timely.[12]  The final denial occurred at the pretrial conference.[13]

Prior to the commencement of the trial on June 24, 2002, the court gave the parties a set of jury instructions and elicited their comments.  The set did not include an instruction on the defendants' statute of limitations defense.  In response, the defendants sent the court an instruction on the statute of limitations defense.  The court did not act on it, however, until trial, after the plaintiffs had rested and the defendants were putting on their case.

---

[12]  In its order of May 31, 2001, the court said:

> Plaintiffs argue that their claims were tolled at least until the Salvadoran civil war ended on January 16, 1992, which is the date the Salvadoran Peace Accords were negotiated under the auspices of the United Nations, and the independence of the judiciary was restored in El Salvador.  The court agrees.  It is undisputed that prior to this date, El Salvador was in a state of civil war with rampant brutal reprisals initiated by death squads and others.  In this environment, plaintiffs had legitimate reason to conclude their lives, and the lives of their relatives, would be in jeopardy if they initiated human rights litigation against high government officials in El Salvador.

Although the court's order does not indicate the precise source of these facts, it appears that there were several sources: the second amended complaint and the plaintiffs' memoranda filed in response to the defendants' motions to dismiss and for judgment on the pleadings on the statute of limitations ground.  As noted above, the defendants presented their statute of limitations defense on several occasions, and the court rejected it each time.  In the orders entered after the May 31, 2001 order, the court summarily rejected the defense without explanation.

[13]  The pretrial conference was held on May 21, 2002, following which the court entered an omnibus order on all pending motions, including those relating to the statute of limitations defense.

7

The jury instruction aside, the question of whether the statute of limitations barred any of the plaintiffs' claims as a matter of law surfaced at the conclusion of the plaintiffs' case when the defendants moved for judgment as a matter of law. Defense counsel contended that the claims brought by Arce and Maurcio were time-barred because they came to the United States in 1983 and could have filed suit at any time thereafter.[14] The court denied the motion. Considering the evidence in the light most favorable to Arce and Maurcio, the court concluded that a trier of fact could reasonably find that conditions in El Salvador between 1983 and 1992, when the El Salvador Peace Agreement was reached, justified these plaintiffs' delay in filing suit and thus warranted application of equitable tolling.

The question of whether the jury should resolve the equitable tolling issue (as the defendants' proposed jury instruction presumed) was taken up in the midst of the defendants' case. In the absence of the jury, a colloquy ensued between the court and counsel over whether equitable tolling was a matter for the jury or the court to decide. Plaintiffs' counsel contended that the court should decide the issue since it sounded in equity. The court agreed and turned to the evidence bearing on the question of whether the conditions in El Salvador effectively

_____

[14] The record is not clear as to whether counsel sought judgment as a matter of law on Arce's claim. The court cut counsel off in the midst of his argument, and we infer from the colloquy that counsel intended to include Arce's claim along with Maurcio's.

precluded the plaintiffs from filing suit against the defendants until after the El Salvador Peace Agreement was reached in 1992. The court found that until the agreement was reached, the fear of reprisals against the plaintiffs' relatives orchestrated by people aligned with the defendants excused the plaintiffs' delay in prosecuting their claims against the defendants. The court therefore declared the statute of limitations equitably tolled, and that the plaintiffs' claims were timely filed. At this point in the proceedings, and before the jury returned, the plaintiffs announced that they had reduced their nine-count complaint to three claims of torture: Arce's claim under the TVPA and Gonzalez and Mauricio's claims under the ATCA.

Following this announcement, the defendants resumed their defense. Both defendants took the stand. Their testimony related, for the most part, to the issue of whether they had command responsibility for the torture the plaintiffs allegedly endured. They testified that they neither ordered the torture nor participated in it.

At the close of all the evidence, defense counsel moved the court for judgment as matter of law on all claims on the ground that the evidence failed to establish that the defendants exercised command responsibility for the alleged torture. As an additional ground for judgment as a matter of law on Mauricio's claim, which was lodged against Casanova only, counsel asserted that the claim

9

was barred by the statute of limitations. The court denied the motions, and, following counsels' oral arguments, sent the case to the jury. The jury found that the plaintiffs had been tortured, as alleged, held the defendants liable under the doctrine of command responsibility, and returned verdicts totaling $54,600,000.

After the jury returned its verdicts, the defendants filed two motions. One, a motion for judgment as a matter of law or a new trial on all claims, addresses the focus of this appeal, the statute of limitations defense. It asserts that the statute had run prior to the commencement of suit and that "no legally or equitably sufficient reasons" tolled the limitations period. The other motion raises an issue not before us.[15] The court denied their motions, and the defendants appealed.

### III.

The defendants' brief on appeal raises two issues. One of them, the issue dealt with in the brief's argument section, merits discussion: Whether the district

---

[15] This motion sought judgment as a matter of law or a new trial on the ground that the plaintiffs had failed to join indispensable parties, i.e., "the subordinates, their immediate commanders or supervisors of the Defendants." The defendants had moved pretrial to dismiss the case for failure to join such parties, but did not include this ground in their motion for judgment as a matter of law made at the conclusion of all the evidence. Fed. R. Civ. P. 50(b) limits the grounds for a post-verdict motion for judgment as a matter of law to those asserted in the Rule 50(a) motion. See Caban-Wheeler v. Elsea, 71 F.3d 837, 842 (11th Cir. 1996) (holding that defendants could not raise judicial immunity defense in their Rule 50(b) motion because they failed to raise the defense in a Rule 50(a) motion).

court abused its discretion in equitably tolling the statute of limitations.[16]  Abuse

of discretion is the standard of review.  See Ellis v. Gen. Motors Acceptance

Corp., 160 F.3d 703, 706 (11th Cir. 1998) (noting "discretion" of district courts to

apply equitable tolling).  A district court abuses its discretion when it misapplies

the law in reaching its decision or bases its decision on findings of fact that are

clearly erroneous.  See Mincey v. Head, 206 F.3d 1106, 1137 n.69 (11th Cir.

---

[16]  This issue is raised by the defendants' notice of appeal, which challenges the district court's final judgments.  The notice of appeal states that in addition to the judgments, the defendants are appealing: (1) "Order Denying Defendants' Motions for Judgments on the Pleadings and/or New Trial entered July 31, 2002"; (2) "Order Denying Defendants' Motion to Dismiss entered July 26, 1999"; (3) "Order Denying Defendants' Motion to Amend or Alter Judgment and set Aside Default entered February 12, 2001"; (4) "Order Denying Defendants' Motion for Judgments of the Pleadings entered June 1, 2001"; (5) "Order Denying Defendants' Motion for Amendment of Judgment entered June 29, 2001"; (6) "Order Denying Defendants' Motion and Amended Motion for Judgment on the Pleadings/Failure to Exhaust Remedies entered July 27, 2001"; and (7) "Omnibus Order on various Pre-Trial Motions entered May 21, 2002."  Of these rulings, only items (1), (4), (5), and (7) relate to the statute of limitations defense and the equitable tolling issue.  In issuing orders (4), (5), and (7), the court did not exercise its discretion and equitably toll the limitations period; instead, all the court did was to hold that assuming them to be true, the factual allegations of the complaint were legally sufficient to make out a case for tolling.  In order (1), the court (a) rejected Casanova's argument that Mauricio's claim was time-barred as a matter of law, and (b) denied the defendants a new trial on the equitable tolling issue as to all claims.  This leaves the final judgments.  The gist of the defendants' argument, as stated in their brief, is that the district court abused its discretion in tolling the limitations period on all claims.  The only time the court exercised its discretion to do so was at trial, during the presentation of the defendants' case, when the question arose as to whether the court, instead of the jury, should decide the equitable tolling issue.

The second issue the defendants' brief presents is: Whether either defendant fraudulently concealed his identity or whereabouts from any of the plaintiffs.  In raising this issue, the defendants infer that equitable tolling could occur only during such times as they concealed their whereabouts, such that they could not be served with process.  The issue warrants no discussion for two reasons: (1) they failed to present an argument for the point in their brief; (2) the plaintiffs, in contending that equitable tolling rendered timely the filing of their claims, have not relied on concealment as a basis for tolling.

11

2000). In this case, we find no error in the court's application of the law or clear error in its findings of fact.

A.

Statutes of limitations serve important purposes in promoting the fair administration of justice. As the Supreme Court stated in Burnett v. New York Central Railroad Co.:

> Statutes of limitations are primarily designed to assure fairness to defendants. Such statutes "promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared. The theory is that even if one has a just claim it is unjust not to put the adversary on notice to defend within the period of limitation and that the right to be free of stale claims in time comes to prevail over the right to prosecute them." Moreover, the courts ought to be relieved of the burden of trying stale claims when a plaintiff has slept on his rights.

380 U.S. 424, 428, 85 S. Ct. 1050, 1054, 13 L. Ed. 2d 941 (1965) (quoting Order of R.R. Tel'rs v. Ry. Express Agency, Inc., 321 U.S. 342, 348-49, 64 S. Ct. 582, 586, 88 L. Ed. 788 (1944)). Statutes of limitations embody the recognition that the defendant's interest in promptly facing the plaintiff's claims along with the court's interest in hearing only claims that a plaintiff has diligently pursued can trump the plaintiff's right to assert even the most meritorious of claims.

12

The interests of justice, however, can weigh in favor of allowing a plaintiff to assert untimely claims if circumstances beyond the plaintiff's control prevented timely filing. The doctrine of equitable tolling allows a court to toll the statute of limitations until such a time that the court determines would have been fair for the statute of limitations to begin running on the plaintiff's claims. See Justice v. United States, 6 F.3d 1474, 1475 (11th Cir. 1993) ("The doctrine of equitable tolling abates the harsh operation of the statute of limitations under certain circumstances in which barring a plaintiff's potentially meritorious action would be unjust."). "Equitable tolling is appropriate when a movant untimely files because of extraordinary circumstances that are both beyond his control and unavoidable even with diligence." Sandvik v. United States, 177 F.3d 1269, 1271 (11th Cir. 1999) (emphasis added). The plaintiff bears the burden of showing that such extraordinary circumstances exist. Justice, 6 F.3d at 1479. In determining whether a plaintiff meets this burden, we must keep in mind that "[equitable] tolling is an extraordinary remedy which should be extended only sparingly." Id. (citing Irwin v. Dep't of Veterans Affairs, 498 U.S. 89, 96, 111 S. Ct. 453, 457-58, 112 L. Ed. 2d 435 (1990)).

We look to the relevant statute for guidance in determining whether equitable tolling is appropriate in a given situation. "The basic question to be

13

answered in determining whether, under a given set of facts, a statute of limitations is to be tolled, is one 'of legislative intent whether the right shall be enforceable . . . after the prescribed time.'" Burnett, 380 U.S. at 426, 85 S. Ct. at 1053 (alteration in original) (quoting Midstate Horticultural Co. v. Penn. R.R. Co., 320 U.S. 356, 360, 64 S. Ct. 128, 130, 88 L. Ed. 96 (1943)).  We glean legislative intent from "the purposes and policies underlying the limitation provision, the Act itself, and the remedial scheme developed for the enforcement of the rights given by the Act."  Id. at 427, 85 S. Ct. at 1054.

The ATCA and the TVPA promote the protection of human rights internationally – the ATCA by granting aliens access to the federal courts to redress torts "committed in violation of the law of nations or treaties of the United States," 28 U.S.C. § 1350, and the TVPA by granting relief for victims of torture, 28 U.S.C. § 1350 note.  Congress enacted the TVPA "to carry out obligations of the United States under the United Nations Charter and other international agreements pertaining to the protection of human rights . . . ."[17]  Pub. L. No. 102-256, 106 Stat. 73.  Absent a cause of action in the United States courts, some of

---

[17]  For the purposes of discussion, we refer to the legislative history behind the TVPA because it is better documented than that of the ATCA.  This is appropriate given that the statutes share the same statute of limitations, see Cabello v. Fernandez-Larios, 402 F.3d 1148, 1153 (11th Cir. 2005); the same purpose, see Papa v. United States, 281 F.3d 1004, 1012 (9th Cir. 2002) (finding that the TVPA and the ATCA share the purpose of protecting human rights); the same mechanism – civil suits, see id.; and the same location within the United States Code, see id.

14

the most egregious cases of human rights violations might go unheard because regimes that commit the most serious human rights abuses often possess the most woefully inadequate legal mechanisms for redressing those abuses. Congress recognized this problem in enacting the TVPA:

> Judicial protection against flagrant human rights violations is often least effective in those countries where such abuses are most prevalent. A state that practices torture and summary execution is not one that adheres to the rule of law. Consequently, the Torture Victim Protection Act (TVPA) is designed to respond to this situation by providing a civil cause of action in U.S. courts for torture committed abroad.

S. Rep. No. 102-249, at 3-4 (1991). This court must therefore apply equitable tolling to ensure that abuses occurring abroad do not thwart the fair administration of justice in the courts of the United States.

Congress has provided additional, explicit guidance regarding equitable tolling in the TVPA context:

> The legislation provides for a 10-year statute of limitations, but explicitly calls for consideration of all equitable tolling principles in calculating this period with a view toward giving justice to plaintiff's rights. Illustrative, <u>but not exhaustive</u>, of the types of tolling principles which may be applicable include the following. The statute of limitations should be tolled during the time the defendant was absent from the United States or from any jurisdiction in which the same or similar action arising from the same facts may be maintained by the plaintiff, provided that the remedy in that jurisdiction is adequate and available. Excluded also from calculation of the statute of limitations would be the period when a defendant has

15

immunity from suit. The statute of limitations should also be tolled for the period of time in which the plaintiff is imprisoned or otherwise incapacitated. It should also be tolled where the defendant has concealed his or her whereabouts or the plaintiff has been unable to discover the identity of the offender.

S. Rep. No. 102-249, at 10-11 (emphasis added) (footnoted omitted). Congress clearly intends that courts toll the statute of limitations so long as the defendants remain outside the reach of the United States courts or the courts of other, similarly fair legal systems.

Justice may also require tolling where both the plaintiff and the defendant reside in the United States but where the situation in the home state nonetheless remains such that the fair administration of justice would be impossible, even in United States courts. Absent regime change, those in power may wish to protect their former leaders against charges of human rights abuses. The quest for domestic and international legitimacy and power may provide regimes with the incentive to intimidate witnesses, to suppress evidence, and to commit additional human rights abuses against those who speak out against the regime. Such circumstances exemplify "extraordinary circumstances" and may require equitable tolling so long as the perpetrating regime remains in power. See Cabello v. Fernandez-Larios, 402 F.3d 1148, 1155 (11th Cir. 2005) (tolling statute of limitations under the ATCA and the TVPA "[u]ntil the first post-junta civilian

16

president was elected in 1990" for claims against a Chilean military officer);[18]

Hilao v. Estate of Marcos, 103 F.3d 767, 773 (9th Cir. 1996) (tolling statute of limitations for TVPA and ATCA claims against former Philippine dictator Ferdinand Marcos until the Marcos regime in the Philippines was overthrown);[19]

Forti v. Suarez-Mason, 672 F.Supp. 1531, 1550 (N.D. Cal. 1987) (holding that the plaintiff raised an issue of fact as to whether the ATCA statute of limitations should be tolled for claims against an Argentine military officer until a democratically-elected government took power from a military dictatorship in Argentina).[20]

---

[18] In Cabello, the defendant resigned from the Chilean military in 1987 and moved to the United States in the same year. 402 F.3d at 1153. This court nonetheless tolled the statute of limitations until the military dictatorship lost power because, until then, "the Chilean political climate prevented the Cabello family from pursuing any efforts to learn of the incidents surrounding Cabello's murder." Id. at 1155.

[19] While not directly analogous, due to the fact that Marcos fled the Philippines immediately after his regime was ousted in 1986, see 103 F.3d at 771, 773, Hilao supports the proposition that, in some situations, regime change may be necessary before the limitations period begins to run for TVPA and ATCA claims. The following factors influenced the court's decision to toll the statute of limitations: (1) Marcos and those acting at his direction enjoyed immunity from suit while he held office; (2) "many victims of torture in the Philippines did not report the human-rights abuses they suffered out of intimidation and fear of reprisals"; and (3) the Marcos regime controlled the judiciary. Id. at 773 (emphasis added). Considering these factors, the Ninth Circuit tolled the statute of limitations for claims against Marcos "until he left office in February 1986." Id.

[20] The Forti court denied the defendant's motion to dismiss, 672 F.Supp. at 1535, because the complaint alleged that the "military's reign of terror" caused such a breakdown of the Argentine legal system that the plaintiffs "were denied effective access to Argentine courts" until the democratically elected government took over from the military dictatorship. Id. at 1550.

17

B.

The evidence before the district court on the equitable tolling issue established the following:[21] A brutal civil war ravaged El Salvador until a United Nations negotiated peace agreement ended hostilities in 1992.[22] A military regime held power during this time period, and Garcia and Casanova held positions of power in this regime, Garcia from 1979 until 1983 and Casanova from 1979 until 1989. Both defendants became permanent residents of the United States in 1989, Casanova in August and Garcia in October. Until the end of civil war in 1992, the military would have used its significant power to thwart any efforts to redress the human rights violations that it perpetrated. Evidence of those violations would have been suppressed. Potential witnesses would have been intimidated and perhaps tortured if they came forward. The plaintiffs legitimately feared that their

---

[21] The district court found the facts we recite when, during the presentation of the defendants' case to the jury, it ruled that the equitable tolling issue should be submitted to and decided by the court rather than the jury and proceeded to find that the evidence established an equitable basis for tolling the 10-year limitations period until the end of civil war in 1992.

[22] In deciding the tolling issue during the defendants' presentation of their case, the court said:
> [T]here is no dispute in the facts of this case that there was the discord and breakdown of civil law and so on in El Salvador. There was a civil war which was brought to a negotiated resolution in '92.

Record, vol. 19, at 2047.

family members and friends remaining in El Salvador would be subject to harsh reprisals and the same brutalities that the plaintiffs suffered.[23]

The district court's findings of fact are not clearly erroneous; indeed, they are heavily supported by the record. The record swells with evidence regarding the brutality and oppression that the Salvadoran military visited upon the people of El Salvador. The evidence includes reports on abductions, torture, and murder by the military. The evidence reveals a judiciary too meek to stand against the regime. The U.N. Truth Commission Report, published immediately following the end of civil war in 1992 and presented as part of the plaintiffs' case in chief, discloses:

> The situation in El Salvador is such that the population at large continues to believe that many military and police officers in active service or in retirement, Government officials, judges, members of [the military regime] and people who at one time or another were connected with the death squads are in a position to cause serious physical and material injury to any person or institution that shows a

---

[23] In deciding the tolling issue during the defendants' presentation of their case, the court said:

And we talked about the ability to gather evidence, if there were witnesses and so on, and another aspect of that is the nature of the allegation deals with torture inflicted by the governmental entities. The fact that the entities were still in power at that time . . . the fear of retaliation over family members and so on.
. . .
The facts are that the U.N. Peace Accord did not take place until '92, that family members were present in El Salvador, gathering of evidence, seeking – the fear of reprisal were legitimate considerations that would allow the court to toll that.
Record, vol. 19, at 2049-50.

readiness to testify about acts of violence committed between 1980 and 1991. The Commission believes that this suspicion is not unreasonable, given El Salvador's recent history and the power still wielded or, in many cases, wielded until recently by people whose direct involvement in serious acts of violence or in covering up such acts is well known but who have not been required to account for their acts or omissions.

U.N. Sec. Council, From Madness to Hope: The 12-year War in El Salvador: Report of the Commission on the Truth for El Salvador, at 22, U.N. Doc. S/25500 (1993), available at http://www.usip.org/library/tc/doc/reports/el_salvador/tc_es_03151993_toc.html.

## C.

Given the district court's findings of fact, we conclude that it was well within the district court's discretion to toll the statute of limitations until the defendants left El Salvador to reside in the United States, Casanova in August 1989 and Garcia in October 1989. The TVPA's legislative history shows Congress's clear intent that courts toll the statute of limitations so long as the defendants are outside the reach of the United States courts. Such tolling is especially appropriate in this case; Casanova, as Garcia's successor, held one of the most important positions of power within the Salvadoran military until 1989. One would expect him to retaliate against any victim (of torture) who sued him.

When we toll the statute of limitations until the defendants became United States residents, it becomes clear that Arce and Gonzalez's claims are timely; they filed suit on May 11, 1999, within the ten-year statute of limitations for the TVPA and the ATCA.[24]  Unlike Arce and Gonzalez, Mauricio did not join the lawsuit until December 22, 1999, when, with leave of court, Arce and Gonzalez filed their amended complaint.  If the statute of limitations is tolled only until the defendants became United States residents, Mauricio's claims are time-barred.  The district court, however, did not abuse its discretion by tolling the statute of limitations until the end of the civil war in 1992.

The court found that the plaintiffs legitimately feared reprisals from the Salvadoran military, despite the fact that the defendants resided in the United States.  The military regime, in which both Garcia and Casanova had held positions of great influence, remained in power.  State-sponsored acts of violence and oppression continued to ravage El Salvador.  The very regime against whom the plaintiffs leveled their accusations remained intent on maintaining its power at any cost and acted with impunity to do so.  Mauricio could not reasonably have

---

[24]  The claims Arce and Gonzalez brought in their second amended complaint were closely related, if not identical, to the claims asserted in their initial complaint and thus were timely.   See Fed. R. Civ. P. 15(c)(2) ("An amendment of a pleading relates back to the date of the original pleading when . . . the claim . . . asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading . . . .").

21

expected to achieve justice until after the military regime fell from power in 1992; only then could the evidence have come to light and Mauricio have made his claims without fear of reprisal against family and friends in El Salvador.

III.

Statutes of limitations serve important purposes in our legal system and should be strictly enforced in all but the most egregious of circumstances. Mere ambient conflict in another country does not, by itself, justify tolling for suits filed in the United States. From the standpoint of the United States, many countries oppress their citizens today, and many countries have oppressed their citizens in decades and centuries past. A lenient approach to equitable tolling would revive claims dating back decades, if not centuries, when most or all of the eye witnesses would no longer be alive to provide their accounts of the events in question.

This case, however, exemplifies the kind of "extraordinary circumstances" that, in the interests of justice, require equitable tolling. The remedial scheme conceived by the TVPA and the ATCA would fail if courts allowed the clock to run on potentially meritorious claims while the regime responsible for the heinous acts for which these statutes provide redress remains in power, frightening those who may wish to come forward from ever telling their stories. We therefore find that the district court did not abuse its discretion in holding the plaintiffs' claims

22

to be timely under the doctrine of equitable tolling.  The judgment of the district

court is, accordingly,

AFFIRMED.