[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-12511

_____

RAQUEL CAMPS,
in her capacity as the personal representative
of the Estate of Alberto Camps,
ALICIA KRUEGER,
in her individual capacity, and in her capacity
as the personal representative of the
Estate of Ruben Bonet,
MARCELA SANTUCHO,
in her individual capacity, and in her capacity
as the personal representative of the
Estate of Ana Maria Villarreal de Santucho,

Plaintiffs-Appellees,

EDUARDO CAPPELLO,
in his individual capacity, and in his capacity

2                    Opinion of the Court                    23-12511

as the personal representative of the
Estate of Eduardo Cappello,

                                                    Plaintiff-Appellee
                                                    Cross Appellant,

*versus*

ROBERTO GUILLERMO BRAVO,

                                                    Defendant-Appellant
                                                    Cross Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:20-cv-24294-LFL

_____

Before JORDAN and BRASHER, Circuit Judges, and GERAGHTY, * District Judge.

JORDAN, Circuit Judge:

Sometime after three o'clock on the morning of August 22, 1972, military officers at the Almirante Zar Naval Base in Trelew, Argentina, removed nineteen unarmed political prisoners from

_____

* The Honorable Sarah Geraghty, United States District Judge for the Northern District of Georgia, sitting by designation.

their cells and shot them in what became known as the Trelew Massacre. The plaintiffs in this action—Raquel Camps, Alicia Krueger, Marcela Santucho, and Eduardo Cappello—are the surviving family members of four of those prisoners: Alberto Camps, Ruben Bonet, Ana Maria Villarreal de Santucho, and Eduardo Cappello (who shares the same name as one of the plaintiffs). The defendant, Roberto Guillermo Bravo, was one of the officers who participated in the massacre.

In 2020, the plaintiffs filed suit against Mr. Bravo, seeking compensatory and punitive damages under the Torture Victim Protection Act, 28 U.S.C. § 1350 note, for the extrajudicial killing and torture of their relatives. A jury found Mr. Bravo liable for the deaths and awarded the plaintiffs a total of more than $24 million.

Mr. Bravo now appeals, arguing that the district court erred by equitably tolling the TVPA statute of limitations on the plaintiffs' claims until October 15, 2012. Because the district court failed to make sufficient findings of fact to allow us to properly analyze its ruling on equitable tolling, we vacate and remand for additional findings.

I

For much of the 1960s, 1970s, and 1980s, Argentina was governed by various military dictatorships. In 1966, the military overthrew Argentina's democratically-elected government, ushering in a period of violence and instability marked by state-directed torture, killing, and kidnapping. The military regime was extremely

oppressive, arresting and "disappearing" many of those it considered to be "subversives."[1]

## A

On August 15, 1972, a group of twenty-five political prisoners escaped from Rawson Prison in Argentina. Nineteen of the escapees surrendered to the government and were transferred to the Almirante Zar Naval Base in Trelew, Argentina. Mr. Bravo, a commissioned officer in the Argentine military, was stationed at the Almirante Zar Naval Base in August of 1972.

Taking the facts in favor of the jury's verdict, in the early hours of August 22, 1972, Mr. Bravo and three other officers entered the cellblock on the Naval base, ordered all nineteen prisoners out of their cells, and opened fire on them. Mr. Bravo was the first of the officers to shoot, emptying his entire magazine. Some of the prisoners were shot "at point-blank range"; one of the victims was shot from behind, execution-style in the neck; and a pregnant woman was shot "from her breasts down."

Sixteen of the prisoners were killed, while three survived with severe injuries. Alberto Camps—shot in the stomach by Mr. Bravo as he hid in his cell—was among the initial survivors of the Trelew massacre.

---

[1] The period from the early 1970s to the early 1980s is known as the "Dirty War." *See* Sam Ferguson, The Disappeared: Remnants of a Dirty War 1 (2023); Paul H. Lewis, Guerillas and Generals: The "Dirty War" in Argentina 5 (2002).

The military government sought to cover up the murders, adopting as the official narrative that the officers had shot the prisoners in self-defense during an escape attempt. Soldiers threatened witnesses who might contradict the official story.

A military investigation culminated in a 1972 General Auditor's Report, which set out the government's position that the prisoners had been killed by the officers in self-defense. That report, which included a contemporaneous statement from Mr. Camps that conflicted with the government's version of events, was labeled "Top Secret" and kept from the public until 2008.

A couple of months after the massacre, the military government sent Mr. Bravo and his family to the United States in order to make him "harder to find." It also engaged in significant press censorship, criminalizing the publication of any alternative to the official version of events.

**B**

Between 1973 and 1976, a democratically-elected government was briefly in power in Argentina, but a coup in 1976 brought a return to military rule. The new military regime engaged in a "systematic campaign of extermination against [subversives]" and is considered to have presided over one of the "darkest period[s]" in Argentine history. *See* D.E. 132 at 65:1–6.

Those who sought justice for the victims of the Trelew Massacre (e.g., by contesting the official account) were targeted by the military regime. For example, Mr. Camps—who survived the shooting and gave a statement to investigators that contradicted

the regime's position—was killed by the military in 1977. His brother was kidnapped and was "disappeared" in 1976, and his wife was "disappeared" in 1977, leaving his daughter, Raquel Camps, orphaned. Eduardo Cappello's parents filed a lawsuit against the government in 1974, seeking justice for the murder of their son. In 1977, the military regime "disappeared" their other son, along with his wife and their 12-year-old son.

Lawyers who attempted to represent the victims and their families put themselves in grave danger. Alicia Krueger, Ruben Bonet's widow, filed a lawsuit seeking monetary compensation from the Argentine government in 1972. Two years later, Ms. Krueger's lawyer was murdered by one of the regime's "death squads." This forced Ms. Krueger and her family to go into hiding. They eventually fled to France as political refugees and changed their last name. The sister of Ana Maria Villarreal de Santucho, who was a lawyer herself, filed a lawsuit on Ms. Santucho's behalf but was "disappeared" by the regime in 1976. And Ms. Santucho's daughter, Marcela Santucho, was herself kidnapped and detained by the military for a week when she was just a child. She later fled the country and did not return permanently until 2008.

Military rule persisted in Argentina until 1983, when the country's citizens elected a democratic government. The new government, however, was fragile and the military remained influential. When the democratic government attempted to form a truth commission and prosecute military leaders for human rights abuses, the military plotted its overthrow, engaging in a series of

rebellions and a bombing campaign. This resulted in the passage of two amnesty laws that further undermined accountability efforts until at least 2003.

## C

In 2005, Argentina began an investigation into the Trelew Massacre and—for the first time—offered witness protection to the victims' families. The plaintiffs participated extensively in the investigation and the eventual criminal prosecution. For example, Ms. Camps filed a complaint asking the government to prosecute the individuals who had taken part in the massacre. A criminal case against Mr. Bravo, Luis Emilio Sosa, Carlos Amadeo Marandino, Emilio Jorge Del Real, Jorge Enrique Bautista, and Norberto Paccagnini formally began in 2005.

On February 1, 2008, a federal judge in Argentina issued an arrest warrant for Mr. Bravo. The Argentine government was, however, unable to locate Mr. Bravo without the assistance of Interpol, which determined in early March of 2008 that he was in Florida. Because Argentine law prohibits criminal trials in absentia, the other defendants were tried but the case against Mr. Bravo was paused pending his extradition to Argentina.

Argentina first filed a request to extradite Mr. Bravo—who had become a United States citizen in 1987—in the Southern District of Florida in March of 2010. The United States moved for an order certifying the extradition of Mr. Bravo, but a magistrate

judge denied that motion in November of 2010. *See In re Bravo*, No. 1:10-mc-20559-RLD (S.D. Fla. Nov. 1, 2010).[2]

On October 15, 2012, an Argentine criminal court convicted Mr. Sosa and Mr. Del Real—Mr. Bravo's alleged co-perpetrators—of homicide committed with malice for the killing of the sixteen prisoners and the attempted homicide of those who survived. They each received life sentences for their roles in the Trelew Massacre.

Eight years later—on October 20, 2020—the plaintiffs filed suit against Mr. Bravo, bringing claims under the TVPA for the torture of their family members, for the extrajudicial killing of Mr. Bonet, Ms. Villareal de Santucho, and Mr. Cappello, and the attempted extrajudicial killing of Mr. Camps. Mr. Bravo answered the complaint, raising three affirmative defenses: that the shootings were acts of self-defense; that the plaintiffs failed to exhaust local remedies; and that the claims were barred by the statute of limitations.

Prior to trial, the plaintiffs filed a motion in limine asking the district court to "preclude references to communism and Cuba." In particular, the plaintiffs sought to exclude any argument or introduction of evidence that the victims of the Trelew Massacre were communists and that the six escapees from Rawson Prison who did

---

[2] In 2019, Argentina filed a second request for the extradition of Mr. Bravo, and the United States again moved for an order certifying his extradition. A magistrate judge denied this second extradition request due to the "political offense" exception in the treaty between Argentina and the United States. *See In re Bravo*, No. 19-23851-mc-Torres, 2023 WL 6462456 (S.D. Fla. Oct. 3, 2023).

not surrender made it to Chile and were then given safe passage to Cuba. The district court ruled that this evidence was inadmissible under Rule 401, as the prisoners' "purported political views and ties to Cuba" were irrelevant to Mr. Bravo's argument that he acted in self-defense. The district court was also "convinced" that Mr. Bravo sought to improperly use this evidence to prove the decedents' "propensity for violence." Evidence that the victims "acted violently because they were violent" was "clearly inadmissible character evidence" under Rule 404, the district court ruled.

The jury trial lasted five days. On day two of the trial, Mr. Bravo moved for judgment as a matter of law, arguing that equitable tolling was unavailable to the plaintiffs and that, in any event, the district court—not the jury—should decide that question. The district court denied the motion in open court, concluding that the issue of equitable tolling should be submitted to the jury. The jury ultimately found that the plaintiffs had proven that extraordinary circumstances tolled the ten-year statute of limitations, and that Mr. Bravo was liable for the torture and killings of their family members. The jury returned a verdict in favor of the plaintiffs and awarded them $24,250,000 in damages.

Mr. Bravo then renewed his motion for judgment as a matter of law, alternatively asking the district court to amend the judgment. *See* Fed. R. Civ. P. 59(e). The district court held a hearing on the motion and issued an order granting it in part. The district court reconsidered its earlier equitable tolling ruling, concluding that "it

was clear error to submit to the jury the question of whether extraordinary circumstances existed to toll the statute of limitations."

The district court then separately issued findings of fact and conclusions of law on equitable tolling. Acknowledging that it was "an exceptionally close question," the district court concluded that extraordinary circumstances tolled the statute of limitations "until the conclusion of the [Argentine] criminal prosecution . . . in October 2012." Specifically, the plaintiffs' "fear of reprisal," inability to locate Mr. Bravo, and "inability to discover evidence in support of their claims" constituted extraordinary circumstances that prevented the plaintiffs from timely filing their TVPA claims.

Fear of reprisal prevented the plaintiffs from bringing their claims until 2005, "when efforts to hold the military accountable restarted." The plaintiffs' inability to locate Mr. Bravo, in conjunction with their fear of reprisal, equitably tolled the statute of limitations until March 3, 2008. The district court also found that the plaintiffs were unable to discover "crucial evidence" in support of their claims until the conclusion of the criminal prosecution in Argentina. The combination of those three factors, the district court concluded, equitably tolled the statute of limitations until October 15, 2012. Because it found that the plaintiffs' inability to discover crucial evidence tolled the limitations period such that the TVPA claims were timely, the district court did not reach the plaintiffs' argument that their reliance on a domestic truth and accountability proceeding (i.e., the criminal prosecution) tolled the statute of

limitations until the denial of the Argentine government's first request to extradite Mr. Bravo on November 1, 2010.

The district court next considered whether the plaintiffs had acted with due diligence in filing their claims. The district court thought it was important to "consider the conduct of the individual [p]laintiffs in the case"—not the actions taken by their family members on behalf of their relatives' estates. By this metric, Ms. Camps, Ms. Krueger, and Ms. Santucho had all diligently pursued their claims by seeking "at least some civil remedies in Argentina" in the form of compensation and reparations, as well as by participating in the criminal prosecution of the perpetrators of the Trelew Massacre. In contrast, Mr. Cappello was not a direct participant in the criminal proceeding and did not begin to pursue his claims until 2016, when he "took the place of his grandmother upon her death in the efforts to facilitate" Mr. Bravo's extradition. Mr. Cappello's grandmother had—like the other plaintiffs—received compensation from the Argentine government, but the district court found that it was not clear what Mr. Cappello's efforts, "as opposed to those of his grandmother, were." As a result, the district court concluded that only Ms. Camps, Ms. Krueger, and Ms. Santucho were entitled to equitable tolling. The district court then entered an amended judgment which dismissed Mr. Cappello's claim.

Mr. Bravo appealed, and Mr. Cappello filed a cross-appeal soon thereafter.

## II

The district court's ultimate decision to equitably toll the TVPA's statute of limitations is subject to plenary review, but underlying factual findings are reviewed for clear error. *See Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1153 (11th Cir. 2005). When a district court fails to make sufficient findings "to permit meaningful appellate review," we can remand for additional findings. *See Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 637–38 (11th Cir. 2010).

We review "'the district court's ruling on admission of evidence for abuse of discretion.'" *United States v. McGregor*, 960 F.3d 1319, 1323 (11th Cir. 2020*)* (quoting *United States v. Jimenez*, 224 F.3d 1243, 1249 (11th Cir. 2000)). This standard gives the district court a "range of choice," and we will not reverse "unless the ruling is manifestly erroneous." *United States v. Frazier*, 387 F.3d 1244, 1258–59 (11th Cir. 2004) (en banc) (quotation marks and citations omitted).

## III

Congress enacted the TVPA in 1992 "to carry out obligations of the United States under the United Nations Charter and other international agreements pertaining to the protection of human rights . . ." Pub. L. No. 102–256, 106 Stat. 73 (1992). The TVPA provides a cause of action in United States courts for torture and extrajudicial killings committed "under actual or apparent authority, or under color of law, of any foreign nation." 28 U.S.C. § 1350 note. It is designed to ensure that "the most egregious cases of

human rights violations" do not "go unheard." *Arce v. Garcia*, 434 F.3d 1254, 1261–62 (11th Cir. 2006).

## A

Claims brought under the TVPA are subject to a ten-year statute of limitations. *See* 28 U.S.C. § 1350, historical and statutory notes § 2(c) ("No action shall be maintained under this section unless it is commenced within 10 years after the cause of action arose."); *Arce*, 434 F.3d at 1264 (stating that the TVPA has a ten-year statute of limitations). The plaintiffs therefore had to bring their claims—at the latest—by March of 2002, ten years after the enactment of the TVPA.

Our precedent, however, establishes that the TVPA's statute of limitations may be equitably tolled. *See Cabello*, 402 F.3d at 1154. "The doctrine of equitable tolling allows a court to toll the statute of limitations until such a time that the court determines would have been fair for the [limitations period] to begin running on the plaintiff's claims." *Arce*, 434 F.3d at 1261.

Equitable tolling is appropriate when a plaintiff demonstrates that his filing is untimely "because of extraordinary circumstances that are both beyond his control and unavoidable even with diligence." *Id.* (quoting *Sandvik v. United States*, 177 F.3d 1269, 1271 (11th Cir. 1999)). This is a "fact-specific determination because a finding of extraordinary circumstances necessary for equitable tolling is reserved for extraordinary facts." *Cabello*, 402 F.3d at 1154–55 (brackets and internal quotation marks omitted).

The TVPA "explicitly calls for consideration of all equitable tolling principles . . . with a view toward giving justice to plaintiff's rights." S. Rep. No. 102–249, at 10–11 (1991). A Senate report on the TVPA listed the following as "[i]llustrative, but not exhaustive, of the types of tolling principles which may be applicable":

> The statute of limitations should be tolled during the time the defendant was absent from the United States or from any jurisdiction in which the same or similar action arising from the same facts may be maintained by the plaintiff, provided that the remedy in that jurisdiction is adequate and available. Excluded also from calculation of the statute of limitations would be the period when a defendant has immunity from suit. The statute of limitations should also be tolled for the period of time in which the plaintiff is imprisoned or otherwise incapacitated. It should also be tolled where the defendant has concealed his or her whereabouts or the plaintiff has been unable to discover the identity of the offender.

*Id.* at 11. *See Jean v. Dorelien*, 431 F.3d 776, 779–80 (11th Cir. 2005) (considering this Senate report in analyzing equitable tolling under the TVPA).

In a number of cases we have held that the TVPA's ten-year statute of limitations should be tolled when the plaintiff has no reasonable way of discovering the wrong perpetrated against him, *Cabello*, 402 F.3d at 1155; until the defendant enters the United States and personal jurisdiction can be obtained over him, *Jean*, 431 F.3d

at 779–80; and while the regime that perpetrated the abuses remains in power, *Arce*, 434 F.3d at 1262–63.

The district court concluded that extraordinary circumstances tolled the statute of limitations until October 15, 2012. Again, three factors supported its conclusion: (1) the plaintiffs' fear of reprisal; (2) the plaintiffs' inability to identify and locate Mr. Bravo; and (3) the plaintiffs' inability to discover crucial evidence until the conclusion of the criminal prosecution against the other perpetrators of the Trelew Massacre. According to the district court, the first factor supported tolling until 2005, when a democratic government was in power and "efforts to hold the military accountable" began. The second factor supported tolling until March 3, 2008, when Interpol informed Argentina of Mr. Bravo's location. And the third factor supported tolling until October 15, 2012.

## B

The parties do not dispute that the plaintiffs were entitled to equitable tolling until March 3, 2008. Applying federal common law because the TVPA is a federal statute, *see Branch v. G. Bernd Co.*, 955 F.2d 1574, 1580 (11th Cir. 1992), we concur in their assessment.

The plaintiffs presented ample evidence of their fear of reprisal through at least 2005. For example, Professor James Brennan, the plaintiffs' expert on Argentine history testified that Argentina experienced significant state-directed violence during the 1970s and 1980s. The military regime operated "death squads" that targeted opponents of the regime known as "subversives." Anyone seeking

justice on behalf of a family member who had suffered human rights abuses would have been labeled a "subversive" and targeted.

In addition, the plaintiffs testified to their own experiences with reprisals and violence. After the lawyer who sought justice for her husband was murdered by the military regime in 1974, Ms. Krueger and her family went into hiding, changed their last name, and fled as political refugees to France. Mr. Cappello's grandparents also attempted to file a lawsuit related to their son's death. That resulted in the regime "disappearing" Mr. Cappello's mother, father, brother, and the lawyers representing his grandparents. When Ms. Santucho's aunt tried to file a lawsuit, she too was "disappeared." And Ms. Santucho herself was kidnapped and detained for a week by the military when she was just a child. She later fled the country and did not return until 2008. Though Ms. Camps' father initially survived the Trelew Massacre, he was eventually killed by the government in 1977, and her mother was "disappeared."

In sum, all of the families, and their lawyers, were targeted and persecuted for their attempts to seek justice. Even with a democratic government in place, the military remained influential and protected by amnesty laws until 2003. We thus conclude that the district court correctly tolled the statute of limitations until 2005. *See Arce*, 402 F.3d at 1262–63.

It also seems reasonable to us that if Argentina was unable to locate Mr. Bravo until receiving information from Interpol, the plaintiffs could not find him before then either. So equitable tolling

was appropriate through March of 2008, when Mr. Bravo was located by Interpol. *See Jean*, 431 F.3d at 779–80.

## C

The plaintiffs filed suit on October 20, 2020. The critical question is whether the plaintiffs were entitled to equitable tolling beyond March of 2008 and through at least October of 2010.

It is the third factor that the district court relied on—the plaintiffs' "inability to discover evidence in support of their claims"—that gives us pause. The district court concluded, based on this factor, that the TVPA limitations period should be equitably tolled until October 15, 2012, when the criminal prosecution of Mr. Bravo's co-perpetrators in Argentina concluded. In the district court's view, "[a] quantum of discoverable evidence sufficient to support criminal convictions in Argentina was by that time discoverable and available to [the plaintiffs]." On this record, we have some concerns about this third factor.

### 1

First, this factor—as the district court has formulated and applied it—may be in tension with our equitable tolling precedent. Our TVPA cases suggest that equitable tolling applies until the plaintiff "can investigate and compile evidence without fear of reprisals." *Jean*, 431 F.3d at 780. *See also Cabello*, 402 F.3d at 1155 (equitably tolling the statute of limitations while "the Chilean political climate prevented the Cabello family from pursuing any efforts to learn of the incidents surrounding Cabello's murder"); *Warfaa v. Ali*, 1 F.4th 289, 295 (4th Cir. 2021) ("[P]ermitting tolling until

claimants have the ability to both compile evidence supporting their claims and pursue claims without fear of reprisal falls within the purpose of equitable tolling specifically and the TVPA more generally."). And in another case involving a federal claim we specifically rejected the "suggestion" that equitable tolling is appropriate until the plaintiffs "have all of the information necessary to prevail on their . . . claims." *Ross v. Buckeye Cellulose Corp.*, 980 F.2d 648, 660 n.19 (11th Cir. 1993) (Title VII disparate impact case). Instead, the "inquiry into whether equitable concerns justify tolling the limitations period focuses on whether [the plaintiffs] knew or reasonably should have known [about the defendant's unlawful conduct], not on whether [the plaintiffs] had enough evidence to prosecute successfully their . . . claims at trial." *Id.*

It's true that we have held that equitable tolling is appropriate in a TVPA case where "the plaintiff has no reasonable way of discovering the wrong perpetrated against her." *Cabello*, 402 F.3d at 1154–55. In *Cabello*, for example, the plaintiffs were aware by 1973 that their relative had been killed and that unknown military officers were involved. *See id.* at 1155. Yet, because of the Chilean government's "deliberate concealment" of both the manner of the relative's death and his burial place, the plaintiffs did not know that he had been tortured and murdered until 1990, when a civilian president was elected and his unmarked grave was located. *See id.* The plaintiffs' inability to discover this evidence resulted from both a fear of reprisal while the military regime remained in power and a deliberate cover-up of the torture and murder of their relative. And the evidence they discovered went to the very heart of their

23-12511                Opinion of the Court                19

claim: They did not know before then that there had been torture and an extrajudicial killing.

That is not the scenario we are faced with here. By 2008, the democratic Argentine government had begun investigating the Trelew Massacre and prosecuting its perpetrators. The plaintiffs may no longer have been unable to investigate and find out what happened to their family members. The government was certainly no longer engaging in "deliberate concealment." And given the survival and post-massacre statement of Mr. Camps, the plaintiffs may have known that their family members had been massacred at the Almirante Zar Naval Base in the 1970s. Indeed, several of them brought suit in Argentina around that time.

### 2

Second, the district court's reasoning and factual findings do not provide sufficient support for tolling the statute of limitations until October 15, 2012. Maybe there was some crucial evidence that was missing and did not allow the plaintiffs to sue before October of 2020. But the district court's order is devoid of factual support for a finding that the *end* of the criminal trial in Argentina is the point from which the statute of limitations should begin to run. *See, e.g., Credit Suisse Sec. (USA) LLC v. Simmonds*, 566 U.S. 221, 227 (2012) ("Allowing [equitable] tolling to continue beyond the point at which a . . . plaintiff is aware, or should have been aware, of the facts underlying the claim would quite certainly be *inequitable* and inconsistent with the general purpose of statutes of limitations[.]") (internal quotation marks and citation omitted). Again, the

limitations period is not equitably tolled until the plaintiffs have sufficient evidence to prevail at trial. *See Ross*, 980 F.2d at 660 n. 19.

The Argentine government began a criminal investigation into the massacre in 2005 and the suspected perpetrators were formally accused in March of 2006. The district court stated that the evidence available to the plaintiffs "*prior* to the criminal prosecution was relatively limited," D.E. 180 at 22 (emphasis added), but this statement illustrates the problem. It may be that the available evidence was limited *before the prosecution began*, but it is also possible that the plaintiffs had access to evidence as it was presented and disclosed during the criminal proceeding, particularly given their extensive involvement in the investigation and prosecution. We just do not know.

Also potentially important is that the Argentine government filed an extradition request in the Southern District of Florida for Mr. Bravo in March of 2010. *See In re Bravo*, Case No. 1:10-mc-20559-RLD (S.D. Fla. 2010). At least some of the evidence against Mr. Bravo—unearthed during the investigation—was presumably filed on the public docket as of that date. So it is possible that the plaintiffs had sufficient evidence to bring their TVPA claims at that point. The district court failed to address this possibility, and did not make any findings explaining why the *end* of the criminal prosecution in Argentina was the critical date for the running of the statute of limitations.

Most of the evidence that the district court considered to be critical became available "through the criminal prosecution in

Argentina and *only after 2008*." D.E. 180 at 22 (emphasis added). For example, the district court cited the forensic reconstruction of the crime scene at the Almirante Zar Naval Base as an example of "crucial evidence" that supposedly only became available at the conclusion of the prosecution. But, as far as we can tell, this piece of evidence seems to have been presented to the Argentine criminal court around 2008. Indeed, elsewhere in its order the district court stated that this "crucial evidence in support of [the plaintiffs'] claims became discoverable after 2008 in connection with the criminal prosecution." *Id.* at 24. So, even if the reconstruction evidence was critical—such that the plaintiffs couldn't bring their TVPA claims without it—we lack the facts to determine whether they were unaware of it or unable to access it before 2012.

The district court also noted that the 1972 Report of the General Auditor, which described the massacre as self-defense, was also "not made available until the Argentine criminal prosecution." According to the district court, this was sometime "around 2006," and there was "no evidence" that the plaintiffs could have accessed it before then. We accept that finding, but there is no evidence—at least none that we can find—that the plaintiffs were unable to access the report until October of 2012.

We vacate the district court's judgment and remand for additional fact-finding and consideration of equitable tolling consistent with our discussion. If upon further consideration, the district court determines that the third factor does not support equitably tolling the statute of limitations until at least October of 2010

or later, it should address the plaintiffs' argument that the criminal prosecution in this case is an analog for a domestic truth and accountability proceeding. If meritorious, that argument might toll the statute of limitations so as to render the plaintiffs' claims timely. We express no view on that matter.

## IV

Mr. Cappello cross-appeals the district court's determination that he did not act diligently in bringing his TVPA claims. On remand, the district court should take a fresh look at this issue if it concludes that the plaintiffs are entitled to equitable tolling that makes their TVPA claims timely.

In overturning the jury's verdict in favor of Mr. Cappello, the district court reasoned that it "must take care to consider the conduct of the individual [p]laintiffs in this case" because "[m]uch of the evidence and argument regarding [p]laintiffs' diligence in this case attributed the actions of [p]laintiffs' families and other family members to the current [p]laintiffs who have brought this case." D.E. 180 at 24. It then found that Mr. Cappello had not exercised diligence because he only began pursuing his claims in 2016, when his grandmother, Soledad Cappello—who had been seeking various remedies on behalf of her son (Mr. Cappello's uncle)—passed away. *See id.* at 24–25. But that analysis ignores the fact that Mr. Cappello brought claims in both his individual capacity *and* in his capacity as the representative of his uncle's estate.

Rule 9(a)(1) of the Federal Rules of Civil Procedure states that a plaintiff need not specifically plead his "authority to sue . . .

in a representative capacity." And Rule 9(a)(2) provides that to raise an issue about authority to sue, "a party must do so by a specific denial, which must state any supporting facts that are peculiarly within the party's knowledge." Here Mr. Bravo withdrew any denial or defense that Mr. Cappello could not properly sue in a representative capacity on behalf of his uncle's estate. *See* D.E. 43 at 4 (withdrawing affirmative defense that the "[p]laintiffs lack standing or capacity under applicable law to bring these claims"). *See also* D.E. 48 at 2; D.E. 148 at 83. So the capacity-to-sue issue was not properly joined, and Mr. Cappello reasonably believed that he did not need to present any affirmative evidence about his authority to sue.

Moreover, at trial Mr. Bravo never made a Rule 50 motion against Mr. Cappello on the ground that he lacked authority to sue in a representative capacity. Indeed, Mr. Bravo never challenged the authority of any of the plaintiffs to sue, whether in their individual or representative capacities. The most that Mr. Bravo said at trial was that he did not know if Mr. Cappello was an authorized representative for his uncle's estate. And Mr. Bravo's renewed motion for judgment as a matter of law argued only that the punitive damages the jury awarded to Mr. Cappello were excessive.

On this record, then, Mr. Cappello—like the other plaintiffs—was properly suing in a representative capacity. That should have informed the district court's diligence analysis.

For purposes of equitable tolling, an estate representative's diligence should be evaluated by reference to the conduct of the

individuals who preceded him in that role. "Generally speaking, the powers granted to the original personal representative of an estate flow to a successor personal representative." 31 Am. Jur. 2d *Executors and Administrators* § 882 (May 2025 update). *See also id.* at § 885 ("A successor representative is . . . bound by the latter's lawful acts performed within the scope of the predecessor's duties."). *Accord Bookman v. Davidson*, 136 So.3d 1276, 1279 (Fla. 1st DCA 2014) (holding that under Florida law "the powers granted to the original personal representative flow to the successor personal representative"). The diligence inquiry for purposes of equitable tolling therefore must focus on the actions of all those who previously represented the estate of the deceased Eduardo Cappello, who is Mr. Cappello's uncle. *See id.* at § 882 (explaining that the "successor is required to proceed as if the successor's administration is a continuation of the former one and may sue to recover estate assets"); Uniform Probate Code § 3-716 (1969 & 2025 update) ("A successor personal representative has the same power and duty as the original personal representative to complete the administration and distribution of the estate[.]"); *Cunningham v. Fla. Dept. of Children and Families*, 782 So.2d 913, 914 (Fla. 1st DCA 2001) (agreeing that "notice of [a wrongful death claim] given by the original personal representative should be imputed to [the successor] personal representative under the doctrines of relation back and substitution of parties"). *Cf.* Restatement (Third) of Trusts § 85(2) (Am. L. Inst. 2007) ("Except as otherwise provided by the terms of the trust, the

powers of a trustee . . . pass to and are exercisable by substitute or successor trustees").

According to Mr. Cappello, the district court should have credited his uncle's estate with his grandmother's diligence in pursuing a remedy for the massacre. Mr. Bravo responds that there is no evidence in the record that Mr. Cappello's grandmother was a personal representative of the estate, or that she did anything for the estate, and Mr. Cappello therefore could not have stepped into her shoes. But there was some evidence at trial that Mr. Cappello had taken over his grandmother's efforts to get justice for his uncle. Mr. Cappello testified that when his grandmother, Ms. Cappello, passed away in 2016, he "took her place" in trying to "achieve [Mr.] Bravo's extradition to Argentina." D.E. 140 at 80. Ms. Cappello, the mother of the deceased Mr. Cappello, participated in the Argentine criminal prosecution and in efforts to extradite Mr. Bravo. Moreover, Ms. Cappello also sought and received compensation from the Argentine government as the beneficiary of the deceased Mr. Cappello's estate.

We express no view on whether Mr. Cappello's grandmother was indeed the previous estate representative or whether she acted with diligence in that capacity. But the district court must at least analyze these issues, and consider whether Mr. Cappello gets the benefit of her diligence for purposes of equitable tolling.

We therefore vacate the judgment setting aside the jury award in favor of Mr. Cappello and remand to the district court for

further consideration of whether he acted diligently in pursuing his claims in a representative capacity on behalf of his uncle's estate.

## V

Finally, Mr. Bravo challenges the district court's exclusion under Rule 404(a)(1) of evidence that the victims of the Trelew Massacre had "ties to communism and Cuba." The plaintiffs argued below, and the district court agreed, that Mr. Bravo should not be allowed to "inflame the jury, invoke anti-communist sentiment, and improperly suggest that [his] victims were more likely to act violently because of their purported political views." On appeal, Mr. Bravo argues that the district court erred because this evidence demonstrated that the victims had a "propensity for violence" that led him to fear for his life.

"Rule 404 of the Federal Rules of Evidence prohibits introducing '[e]vidence of a person's character or character trait . . . to prove that on a particular occasion the person acted in accordance with the character or trait.'" *United States v. Ahmed*, 73 F.4th 1363, 1384 (11th Cir. 2023) (quoting Fed. R. Evid. 404(a)(1)). "An analysis of the admissibility of character evidence necessarily begins, then, with an examination of the purposes for which the evidence is proffered." *Reyes v. Missouri Pac. R. Co.*, 589 F.2d 791, 794 (5th Cir. 1979).

In excluding the evidence under Rule 404(a)(1), the district court reasoned that Mr. Bravo sought to use the victims' purported communist ties and political beliefs as impermissible propensity evidence. He was trying, the district court said, to use the victims' alleged affiliation with communist groups to prove that they had

23-12511                Opinion of the Court                27

acted violently on the night of the massacre, and that he had acted in self-defense as a result.

Reviewing for abuse of discretion, *see McGregor*, 960 F.3d at 1323, we do not discern any error. Mr. Bravo's own argument confirms that the victims' alleged beliefs were going to be used to show their propensity for violence. And his challenge appears to be based on a misapprehension of both the record and the district court's ruling.

The district court, he says, "improperly conflated the issues of communist affiliation with propensity for violence." Appellant's Br. at 54. Not so. Rather, Mr. Bravo conflates evidence that the victims had, a week prior, escaped from another prison and killed a guard in the process, with evidence of their alleged communist views. He incorrectly suggests that the district court's ruling precluded the jury from hearing about the escape. But the jury heard evidence about the riot and the escape, including testimony that a guard was killed. The jury also heard that the victims were "fanatically dangerous." The district court only excluded evidence of the victims' "purported political views and ties to Cuba." D.E. 90 at 11. [3]

We cannot say the district court abused its discretion in concluding that introducing evidence to prove that the Trelew

---

[3] On appeal, Mr. Bravo now argues that this evidence was admissible under Rule 404(b)(2). But because the jury heard evidence of the victims' extrinsic acts—escaping and shooting a prison guard—without the victims being labeled as "communists," this argument also fails.

prisoners "acted violently because they were violent" constitutes impermissible character evidence.

## VI

The district court's judgment is vacated and the case is remanded for proceedings consistent with our opinion. After the district court makes additional findings on the period of equitable tolling, it can decide whether it needs to revisit the matter of the plaintiffs' diligence and make further findings on that issue.

**VACATED AND REMANDED**.